# CHARLESTON.

G. W. HATFIELD v. BOARD OF CANVASSERS OF MINGO CO. *et al.*

NOAH STEPP v. BOARD OF CANVASSERS OF MINGO COUNTY *et al.*
(Nos. 5292-5293.)

Submitted December 18, 1924.  Decided January 20, 1925.

1.  ELECTIONS—MANDAMUS—*Authority of Board of Canvassers
    Stated; Finding of Fact by Board of Election Canvassers not
    Disturbed on Mandamus, Unless Against Weight of Evidence
    or in Contradiction of Returns.*

    The county court sitting as a board of canvassers may sum-
    mon before it the precinct election officers and hear and con-
    sider evidence from them respecting irregularities and dis-
    crepancies in the returns made by them and make such other
    orders as shall seem proper in order to procure correct returns
    and, ascertain the true result of the election held by them;
    and the canvassers' finding of fact from an inspection of the
    returns and consideration of proper evidence before them will
    not be disturbed by the appellate court in mandamus pro-
    ceedings against them unless against the weight of evidence
    or in contradiction of the returns.   (p. 47).

    (Elections, 20 C. J. § 258.)

2.  SAME—*Failure of Voter to Strictly Observe Statutory Rules
    Does Not Invalidate Ballot, if Intention Can Be Determined;
    Intention of Voter is Prime Consideration in Counting Ballot.*

    Failure of a voter to strictly observe the rules stated in Sec.
    34, Chap. 3 of the Code for marking his ballot, does not neces-
    sarily make his ballot invalid, if his intention can be deter-
    mined by an inspection of his ballot when cast..  No technical
    error which does not make it impossible to determine his choice
    shall be sufficient to reject his vote.  The intention of the voter
    is the prime consideration in counting his ballot.  (p. 50).

    Elections, 20 C. J. §  184.)
                          98  W. Va.

3. SAME—*Statute as to Indorsement of Ballots Held Inapplicable to Absent Voter's Ballot; Absent Voter's Ballot Not Void Because Not Indorsed by Poll Clerks in Their Own Handwriting.*

Construing Chap. 55, Acts 1921, the Absent Voters' Statute, and especially Sec. 10 thereof (Sec. 110, Chap. 3, Barnes' Code, 1923) with Sec. 66, Chap. 3, Code 1923 with respect to the provision in the latter that a ballot which is not endorsed on the back by the names of the poll clerks in their own handwriting is void and shall not be counted; it is *held* that the latter does not apply to the absent voter's ballot; and that the provision in said Sec. 10, Chap. 55 (Sec. 110, Chap. 3, Code) which directs that the poll clerks shall write their names on each absent voter's ballot before it is deposited in the ballot box is directory. Their failure to do so does not *ipso facto* render the ballot void.

(Elections, 20 C. J. § 180.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Original proceedings by the State, on relation of G. W. Hatfield, for mandamus to be directed to the Board of Canvassers of Mingo County, and others, and by the State on relation of Noah Stepp for mandamus to be directed to Board of Canvassers of Mingo County, and others.

*Writs denied.*

*Randolph Bias* and *James Damron, J. H. Meek* and *Goodykoontz, Scherr & Slaven,* for relators

*G. R. C. Wiles, Douglas W. Brown* and *Wade H. Bronson,* for respondents.

LIVELY, PRESIDENT:

The two cases involve the same questions and will be disposed of together. Hatfield was Republican candidate for sheriff, and Stepp Republican candidate for assessor at the recent general election November 4, 1924, in the County of Mingo. Bishop was the Democratic candidate for sheriff and Chafin democratic candidate for assessor. These were the sole candidates for the offices named.

The County Court sitting as a board of canvassers found from the face of the election returns that Bishop had received 5,520 votes for sheriff and Hatfield had received 5,500, a majority of 20 for Bishop; and that Chafin for assessor had received 5,432 votes, and Stepp 5,385, making a majority for Chafin of 47. A recount was had at the instance of Hatfield and Stepp, resulting in a finding of 5,555 votes for Bishop, and 5,526 votes for Hatfield, a majority of 29 for the former; and 5,469 for Chafin and 5,403 for Stepp, a majority of 66 for Chafin. Certificates of election were awarded to Bishop and Chafin. At Dingess precinct the returns as found by the board of canvassers gave Bishop 199 and Hatfield 112, a difference of 87 in favor of Bishop; and 198 for Chafin with 111 for Stepp, a majority for Chafin of 87. The recount of this precinct gave Bishop 196 and Hatfield 112, a majority of 84 for Bishop; and for Chafin 198 with 110 for Stepp, a majority of 88 for Chafin. Hatfield and Stepp moved the board to reject the ballots returned from Dingess precinct because when laid before the canvassers they were not properly sealed and preserved as required by law and had lost their value as primary evidence; and they moved that the returns also be rejected because unintelligible and worthless and did not show how many votes had been received by either of the candidates for the offices named. After hearing evidence from the election officials the board overruled the motions. Had the motions been sustained Hatfield would have had a majority on the recount of 55 and Stepp a majority of 22.

Hatfield and Stepp obtained this alternative writ of mandamus, and insist that the returns and ballots at Dingess precinct should be rejected for reasons above assigned; that the ballots at Glen Alum precinct should be rejected because they had not been preserved as required by law and that the certificate of the result at that precinct should be adopted as the best evidence. At that precinct Bishop gained 13 votes over the number given by the certificate of the precinct election officers and Hatfield gained two votes, making a net gain for Bishop of 11 votes. Chafin gained 12 votes and Stepp gained none, making a net gain for Chafin of 12 votes. They also charge that the ballots recounted at Magnolia or

Blackberry precinct should be rejected because they had lost their value as primary evidence and the certificate of the officers should be taken in lieu thereof. At this precinct Bishop gained eight and Hatfield lost six votes—a net gain for Bishop of 14. Chafin gained six and Stepp lost one—a net gain of seven for Chafin.

At various precincts Hatfield challenges the correctness of the count of 19 ballots; 12 of which he claims should have been counted for him, and six of which he insists were improperly counted for Bishop, and one ("Gilbert No. 3") which is not described in his petition. Stepp challenges the correctness of the count of 17 ballots, 12 of which he claims should have been counted for him, and five of which he contends were improperly counted for Chafin.

It is obvious that if the entire vote at Dingess precinct is rejected (both ballots and returns), the relators should receive the certificates of election as the result of the recount, for, as above stated, the recount showed 5,555 votes for Bishop, including the 196 votes at Dingess; and for Hatfield 5,526, including the 112 votes cast for him at Dingess. For Chafin the total vote found was 5,469, including 198 at Dingess; and for Stepp 5,403, including 110 cast for him at Dingess. Reducing these totals by the votes cast at Dingess for each of the contestants, we have for Bishop 5,359 and for Hatfield 5,414, a majority for Hatfield of 55; and for Stepp a majority of 22. The various votes in the different precincts, challenged by respondents as having been improperly counted for the relators will not overcome these majorities if respondents' contentions respecting these segregated votes be upheld. On the other hand, if Dingess precinct be retained and counted Bishop will have a majority over Hatfield of 29 as found by the board if the ballots at that precinct be counted, or if the certificates from that precinct be taken and the ballots discarded, he will have a majority of 32. Chafin's majority will not be materially changed. It is obvious that Stepp's case for relief depends upon whether the Dingess vote is counted, or rejected entirely, for the face of the returns at Glen Alum and Magnolia (or Blackberry) together with the votes at various precincts

challenged by him as being incorrectly counted, will not overcome the 66 majority found against him. But not so with Hatfield. To take the returns at Glen Alum and Magnolia instead of the ballots he will gain 25 votes, leaving Bishop a majority of 7 if the returns are adopted, or a majority of 4 if the ballots are counted. The correctness of the counting of 19 votes challenged by him may overcome this majority of 7 if his contentions in that regard be upheld. The respondents, however, while vigorously asserting that Dingess precinct should not be totally discarded, claim that the face of the returns at Red Jacket, Double Lick, War Eagle and East Williamson precincts should be taken instead of the ballots for the very same reason alleged by the relators against the ballots at Dingess, Glen Alum and Magnolia precincts, namely, that they (the ballots) had not been preserved as required by law and had lost their status as primary evidence; and that at these four precincts first named, Hatfield made a net gain over the face of the returns of 8 votes. Respondents also challenge quite a number of votes in various precincts as incorrectly counted for Hatfield and Stepp and which they say should have been counted for respondents or for no one.

Should relator's motion to exclude from consideration of the board of canvassers the ballots and returns of Dingess precinct have been overruled? The ballots were not sealed nor preserved as required by law. Both relators and respondents Bishop and Chafin agree that they have lost their status as the best evidence of the result at that precinct, although the board of canvassers held otherwise and counted them, with a net result of a gain of 3 for Hatfield and a loss of 1 by Stepp. The ballots were placed in a ballot box and outside of the envelope in which they should have been enclosed and in this condition placed in the custody of an election officer who had the keys to the box and delivered to the County Clerk. Ample opportunity was afforded for tampering. They lost their value as primary evidence, and the motion of relators to reject them as such should have been sustained. Our decisions uniformly so hold. *State ex rel. Gabbert et al.* v. *Robinson,* 88 W. Va. 708; 107 S. E. 763.

The returns from Dingess precinct are challenged as unintelligible, incomplete and inadequate. When these returns were laid before the canvassers they were incomplete and wondrously made. No names of candidates voted for appeared on the tally sheets after those nominated for State offices. Votes by tally marks were recorded on both Republican and Democratic tally sheets for judge of the circuit court; no person was a candidate for that office. Likewise votes were counted for five candidates (not named) on each of the named tally sheets for state senator. Only one person on each ticket was running; likewise four persons (not named) received votes on the tally sheets on each ticket for house of delegates, whereas one candidate on each ticket was running. Votes were recorded and totaled up for judge of the criminal court; there was no such office and no one nominated for it. Four persons (not named) were given votes for county surveyor; two only were nominated. Two persons (not named) were given votes for sheriff, the one on the Democratic ticket was given 199 votes; the one on the Republican ticket, 112. Two persons (not named) were given votes on the tally sheet for assessor; the one on the Democratic ticket totaled 198 votes, the one on the Republican ticket, 111. One poll book recorded 309 persons as having voted; the other 310. The certificate of the number of votes cast had not been filled out; and the printed form of oaths of the election officers had not been filled out, nor signed. The certificates of the result of the election at Dingess appears to have been made up and were found with the returns sent to the county and circuit clerks but were not signed by any one. One of the unsigned certificates showed that "For the office of sheriff ....................received 206 votes;" the other showed that "For the office of sheriff....................received 112 votes." For assessor one certificate recorded an unnamed person as receiving 204 votes; and the other as some unnamed person receiving 111 votes. These incomplete and conflicting returns were attempted to be explained and amended by the election commissioners and poll clerks who were summoned and gave evidence. The votes on the tally sheets recorded for mythical persons not running

and for offices not to be filled were attempted to be explained
by evidence to the effect that whenever a straight ticket was
found the blank spaces opposite each office on the particular
ticket voted were marked with a 1 in order to avoid errors.
It resulted in a comedy of errors.   The discrepancy in the
number of names on the poll books was accounted for by a
failure of one of the poll clerks to record the name of a com-
missioner who voted late in the afternoon.   His name was
thereupon added, and a majority of the commissioners then
signed the certificates of the number of votes cast, in the
presence of the canvassers. It appeared that the officers had
in fact been sworn and the form of oath in the poll book was
filled out to show the fact.   The discrepancies between the
tally sheets and unsigned certificates were accounted for by
admission that some one had got the correct figures mixed up.
On the face of the returns it would be difficult to determine
for whom the votes were cast.   One of the officers said he took
a memorandum from the tally sheets when the votes were
counted which memorandum he filed and which shows that
Hatfield received 112 votes for sheriff and Bishop received
199; that Stepp received 111 votes for assessor and Chafin
198 votes.   This evidence is no more than the interpretation
of the tally sheets by him and is of no higher value than the
tally sheets themselves.   The most that can be said of these
imperfect returns, so far as the parties in interest are con-
cerned, is that a candidate on the Republican ticket for sher-
iff received 112 or 206 votes and a candidate for that office on
the Democratic ticket received either 199 or 206 votes; and
that the Democratic candidate for assessor received between
198 and 204 inclusive; while his opponent received either 111
or possibly 204 votes.   The relators and respondents Bishop
and Chafin were the only candidates for the offices named as
alleged in relators' petitions.   Relators contend that these
imperfect returns cannot be explained nor corrected by the
precinct election officers; and would exclude from considera-
tion as incompetent all of the evidence given by them, rely-
ing upon *Brazie* v. *County Court,* 25 W. Va. 213.   The de-
cision in the Brazie case does not say that evidence of this
character cannot be heard by the canvassers.   On the con-

trary, it holds that they may, under Sec. 21, Chapt. 155, Acts 1882 (Sec. 68, Chapt. 3, Code 1923) require the attendance of the precinct officers and to correct, or have them put in form if they are not so, the returns of the election. The statute says that the canvassers may require the precinct election officers to testify respecting the poll books, tally sheets and certificates and gives the board power to make such other orders as shall seem proper to procure correct returns and ascertain the true result of the election. In so determining the result the board of canvassers exercise quasi-judicial functions; in other respects their functions are ministerial. So says the Brazie case. If the evidence of the precinct officers cannot be considered in order to explain the returns and arrive at a true result, the meaning and purpose of the statute is not perceived. They cannot go behind the election returns and determine whether there was fraud committed in the precinct election prior to the preparation of the certificate of returns. They would then exercise judicial powers not granted to them. *Mahan* v. *Claypool,* decided December 1924, handed down last term. In *Sanders* v. *Board,* 79 W. Va. 303 it was held that evidence of the precinct officers should be heard in order to ascertain the true result where the returns and ballots from the precinct had been stolen and were not available. Judge LYNCH dissented in a forceful note in which he held that in such case the parties should contest before a court of law; but the majority opinion holds that the statute is broad enough to give the canvassing board power to hear and pass upon evidence to establish the true result even when the returns and ballots are not available. We do not have to go to that extent in the instant case; the returns and ballots are not lost. The evidence to explain the returns, we think, was within the power of the canvassers to hear and determine. Did they reach the proper result from consideration of the returns supplemented by the evidence? That is the material question. What effect shall this court give to the finding of fact by this board thus exercising quasi-judicial functions? Without reviewing *in extenso* the evidence and affidavits, some of which are not very clear and satisfactory, we think the canvassers were warranted in concluding

that there were only two candidates for sheriff, Hatfield on the republican ticket and Bishop on the democratic ticket; and a like number for assessor, Stepp and Chafin; that the votes recorded on the tally sheets for the republican candidates for sheriff and assessor were the votes received by Hatfield and Stepp, and those recorded for the democratic candidates for said offices were the votes received by Bishop and Chafin respectively. The evidence further justifies the conclusion that the tally sheets were superior to the unsigned certificates as evidence of the result. We must accord due weight to this finding of fact. Respondents cite *Tunks* v. *Vincent,* (Ky.) 51 S. W. 622, which was a contested election case, and wherein it was held that where the precinct returns showed the number of votes received by the republican and democratic candidates respectively for a particular office, without stating the names of the candidates, it was sufficient. The case is persuasive. If sound in reason to a court in a contest, it would apply with equal force in a recount in an effort to ascertain the true result. Reference is also made to *Lynch* v. *Chalmers,* 2 Ellsw. El. Cas. 338, where it seems to be held that if the tally sheets do not show what officers for whom the votes were cast, but by law the ballots must be returned as a part of the returns, the latter might be inspected to cure the defect in the returns. We do not have access to this authority.

Retaining the returns at Dingess and rejecting the ballots, the application of Stepp for the peremptory writ must be denied, for his alleged errors with respect to other precincts and the counting of certain contested ballots, if sustained, cannot overcome the majority against him by retaining the Dingess vote. By retaining the Dingess returns as corrected and ascertained the majority against Hatfield is 32. He avers that the face of the returns should be adopted at Glen Alum and Magnolia precincts because the ballots at these precincts had lost their value as primary evidence. Acceding to this contention, he would gain a total of 25 votes which would leave a majority against him of 7. On the other hand, respondent Bishop asserts that the returns at four other precincts should be taken instead of the ballots at which Hatfield gained 8 votes.

But unless the board of canvassers has improperly counted the 19 ballots at various precincts challenged by Hatfield to the extent of taking from him 7 votes, it will be unnecessary to pass upon the contention of respondent that the returns and not the votes should be accepted at the four other precincts hereinbefore named.

Section 34 of Chapter 3 of the Code lays down certain rules which the voter should use in marking his ballot. They are not mandatory rules, and there are no positive terms inhibiting the counting of ballots which are not marked in accordance with them. On the contrary, it is provided that no technical error which does not make it impossible to determine the voter's intention shall be invoked to reject the ballot. The intention is the prime consideration if it can be ascertained by inspection of the ballot. 20 C. J., page 154, Section 184, title: "Indication of Voter's Choice." So we come to a consideration of the 19 ballots challenged by Hatfield. Hatfield says that 12 of these ballots should have been counted for him, and 7 which were counted for Bishop should have been rejected and counted for no one. Ballots marked "Dingess No. 1," and ballots marked "Glen Alum No. 1 and 3" are eliminated because the face of the returns at these precincts are taken in lieu of the ballots on Hatfield's motion. We are proceeding on the assumption that the ballots at Glen Alum have lost their efficacy as primary evidence, thus giving Hatfield the advantage of the face of the returns at that precinct. He cannot have the benefit of a miscount of ballots which have been rejected on his motion, and have no efficacy in the recount. "East Williamson No. 5" was marked by an X in ink to the right of the names of the candidates on the republican ticket, including Hatfield for sheriff, instead of in the square in front of the names. No other marks were made. Some person had written in pencil the word "spoiled" across the columns containing the American and Socialist tickets. Evidently this word was placed there by some counting clerk or commissioner indicative of the interpretation of that person of the ballot. It is clear that the intention of the voter was to vote for Hatfield, and it should have been counted for him ·

instead of rejected. "Kermit No. 1" has the X mark in the squares before all of the democratic candidates except one presidential elector, the square before Bishop's name was imperfectly printed, the lower line of the square having failed to print. The voter made a small pencil mark horizontally through the upper line of the imperfect square. It was properly counted for Bishop. The intention is manifest. "Rockhouse No. 1" was marked only by an X in the circle under the democratic emblem and by an X in the circle under the Farmer-Labor ticket. The latter had no candidates for state, county and district offices. We think the intention of the voter was to cast his vote for the state, county and district candidates on the democratic ticket. It was so counted. "Rockhouse No. 2" was marked only by two long lines, one beginning at the upper left-hand corner of the republican ticket and extending to the lower right-hand corner, and the other beginning at the upper right-hand corner and extending to the lower left-hand corner, the two lines thus drawn crossing about one-third of the ticket from the top. None of the other tickets were touched. It is impossible to determine the intention. It was counted for Bishop. We think it should have been rejected entirely. "City Hall No. 1" marked by an X in front of heading, "Democratic Ticket," and before the names John W. Davis and Bryan. Other democratic candidates are voted for by an X in the squares before their names, including Bishop. The only mark on the republican ticket is an X in the square before its candidate for house of delegates. It was properly counted for Bishop. "City Hall No. 8" was marked by an X to the left of Calvin Coolidge, with no other marks on that ticket except erasures through the names of the candidate for house of delegates and candidate for justice of the peace; an X was placed in the square before the democratic candidate for house of delegates and before the candidate for justice of the peace on that ticket. The intention was to vote a straight republican ticket except for those candidates struck off, and should have been, but was not, counted for Hatfield. The only marks on "City Hall No. 9" were an X to the right of Calvin Coolidge, and an X in the squares before one presi-

dential elector, the candidates for governor and state senate. It is reasonably clear that the voter intended to vote only for those persons named. It was properly counted for them alone. "City Hall No. 10" was marked by placing an X to the right of Davis and Bryan, to the right of the democratic candidates for U. S. senator and assessor; an X was placed to the right of Hatfield's name on the republican ticket and to the right of a candidate for constable on that ticket. The intention was to vote for those candidates "X-ed," and should have been counted for Hatfield. It was not counted for him. On "City Hall No. 11" the names of Davis on the democratic ticket and LaFollette on the socialist and farmer-labor ticket were erased, and an X was placed to the left of the name of Coolidge. No other marks were placed on the republican ticket; but the names of the candidates for house of delegates and one candidate for justice of the peace on the democratic ticket were erased. We think the intention was to vote the straight republican ticket. It was not, but should have been counted for Hatfield. "City Hall No. 12" had X marks in the squares before all of the candidates on the democratic ticket except one presidential elector (before whose name an X had been placed and rubbed out), its candidates for attorney general, prosecuting attorney, county commissioner, sheriff, surveyor, and one constable. On the republican ticket an X was placed in the square before one presidential elector, the candidate for prosecuting attorney, county commissioner, and surveyor. An X had been placed before Hatfield's name, but the ballot shows an effort to rub it out by use of a rubber (the marks being made in pencil), and consequently the X is very dim, while the others on the ticket are heavy and plain. It was properly not counted for the office of sheriff. "War Eagle No. 1" had an X in the circle under the republican emblem and erasures of the names of a candidate for justice of the peace and candidate for constable on that ticket. There was a straight mark diagonally through the circle under the democratic emblem, and no other marks elsewhere on that or any other of the tickets. The intention was to vote a straight republican ticket except for the names erased. It was not, but

should have been, counted for Hatfield. "Nolan No. 1,"
marked by an X in the circle under the emblem on the repub-
lican ticket and by an X in the square before Bishop's name
on the democratic ticket, was clearly a vote for Bishop and
was so counted. The exception to this ballot and to "Devon
No. 1" (which is a straight democratic ticket) is that on the
former, one of the poll clerks' names, H. K. Cantrell, was
written on the back, while the other poll clerk, Rose H. Stepp,
signed only "Rose H." on the back. On the latter ticket
(Devon No. 1) one poll clerk, "B. D. Cisco," so signed his
name, but the other, Mary Smith, signed the ballot as "Mary
S." It is conceded that the signatures are in the handwriting
of the respective clerks. We hold that this is a substantial
compliance with that clause in Section 34, Chapter 3, Code,
which requires each poll clerk personally to write his name on
the back of the ballot in ink. The handwriting is the principal
means of identification of the ballot as the one delivered to
the voter to be voted. Hence the signing of the name of one
of the poll clerks by the hand of the other vitiates the ballot.
The dominant purpose of the statute was to prevent spurious
ballots from going into the box and being counted, and the
signatures in the handwriting of the clerks serve to identify
the ballot as the one which has passed through both their hands
to the voter. Shall they sign their full names or use their
initials in connection with their sur-names? Shall the Chris-
tian name and the family name both be appended, or will the
Christian or sur-name alone be sufficient? The statute does
not definitely state. We have held in *Senter* v. *Board of Can-
vassers,* 64 W. Va. 499, that the names of the clerks need not
be on the lines nor in ink in order to comply with the statute,
although the statute so directs, bearing in mind that the pur-
pose of the statute in requiring the personal signature was to
secure on every ballot distinct marks of identification. The
statute does not say that the full name shall be used; if so, it
might be argued that the initials of the Christian name fol-
lowed by the sur-name would not be good. A reasonable con-
struction and not a strained one must be given. There is no
contention that the two poll clerks did not sign by their own

hand; nor is it questioned that "Mary" is the Christian name of Mary Smith who served as poll clerk at Devon precinct, nor that "Rose" is not the Christian name of Rose H. Stepp who actually served as clerk at Nolan precinct. Precedents may be found for holding such signatures as substantially complying with the statute in 9 R. C. L., Sec. 104, p. 1097, citing cases, especially *Perkins* v. *Bertrand,* 192 Ill. 58. "Gilbert No. 3" (erroneously designated in petition as "Gilbert No. 2") has an X before the name of John W. Davis, and an X before a candidate for constable on the republican ticket; no other marks. It is very similar to "City Hall No. 11," which we held to be a straight republican ticket; and was properly counted for Bishop. "Double Lick No. 1" has an X in the circle under the democratic emblem and an X in the squares before a candidate for justice and constable on that ticket; an X is placed in the squares before the presidential electors on the republican ticket and all of the other candidates on that ticket printed below the electors, including Hatfield, except the justice and constable opposed by the justice and constable voted for on the democratic ticket, and except candidates for president and member of board of education. It is reasonably clear that the voter intended to vote for those candidates before whose names he made the X. "Court House No. 6" was marked by an X in the circle under the democratic emblem and by an X in the circle under the farmer-labor emblem, which latter ticket had no candidates for state and county offices. It was properly counted for Bishop. Whatever the voter's intention might have been as to the presidential candidates on the two tickets marked, it is reasonably clear he desired to vote for the democratic county and district candidates. It is similar to "Rockhouse No. 1" above described. One ballot, not described in the petition but mentioned in the argument as challenged is not before us for inspection. We have no means of knowing the markings and cannot consider it. Thus it will be seen that Hatfield should have had counted for him out of these contested ballots 7 votes.

As above noted, respondent Bishop has challenged the action of the board in counting 26 ballots at various precincts, some

of which he claims should not have been counted for Hatfield, and some of which were rejected but should have been counted for respondent. He further says that in the four precincts, namely: Red Jacket, Double Lick, East Williamson, and War Eagle, at which Hatfield gained 8 votes on the recount, the returns should have been adopted as the result; the ballots being in the same unsatisfactory condition as those from Dingess, Glen Alum, and Magnolia. Counsel for relator argues that these ballots challenged by Bishop cannot be considered in this proceeding; that it was the duty of Bishop to also apply for mandamus to compel the canvassers to count properly these ballots challenged by him. The prayer of the petition is for a writ to compel the issuance of a certificate of election to relator. Relator must show a clear legal right to the office before that prayer can be granted. We perceive no good reason why the ballots improperly counted for Hatfield may not be set up in this proceeding as militating against relator's right to the certificate. If these contested ballots were before us in a mandamus proceeding by Bishop the cases would be heard together. Being defensive to the issuance of the writ demanded, they can be properly considered on this application. By stipulation they have been brought before us.

Proceeding to examine the ballots challenged by Bishop, we find that at City Hall ballots Nos. 13, 14, 15 and 16 were votes cast for Bishop by absent voters and were rejected by the canvassers and not counted for Bishop. It appears that the absent voters' statute was complied with, except that the poll clerks had not signed their names on the back of the ballots. By Section 10, Chapter 55, Acts 1921 (Section 110, Chapter 3, Barnes' Code 1923), the commissioners of election, after opening the outer or carrier envelope containing the absent voter's ballot and satisfying themselves of the genuineness of the ballot and the right of the voter to cast it, shall then open the envelope containing the ballot, take out the ballot without unfolding it and deliver it to the poll clerks who shall at once write their names on the back in the same manner as other ballots are required to be endorsed. The ballot is then put in the ballot box by a commissioner and the absent voter's

name entered on the poll book. Does the failure of the clerks to endorse the ballot destroy its validity and disfranchise the voter, as we have often held in cases where they have failed to sign their names personally on ballots cast under the general law? By Section 15 of the Act, it is declared to be an additional method of voting now provided by law and to such extent shall be supplementary and amendatory of the existing laws relating to the manner and method of voting; and by Section 13 the provisions of the election laws not *inconsistent* with that act shall apply with full force so far as applicable to absent voters. By Section 66 of Chapter 3, Code, the general elections law in force at the time of the enactment of the absent voters' statute, it is provided that no ballot shall be counted which is not endorsed by the poll clerks and shall be void. Our cases say that this provision is mandatory. The purpose of the law was to furnish means of identification of the ballot and to prevent spurious ballots from finding their way to the ballot box. The signature and the handwriting furnish two distinct marks of identification. *Kirkpatrick* v. *Deegans,* 53 W. Va. 275; *Senter* v. *Board of Canvassers,* 64 W. Va. 499. The absent voters' act does not contain the provision that the ballot of the absent voter shall not be counted if the names of the clerks are not endorsed thereon. The act is amendatory and supplementary of the general law relating to the manner and method of voting by voters present. By the general law the clerks must endorse their names on a ballot before it is delivered to the voter. The voter is present and must see to it that the names are so endorsed; he is required to so fold his ballot that their names thereon can be seen; it is the right and duty of the voter to inspect his ballot and satisfy himself that it is a legal ballot. *State* v. *Heatherly,* 96 W. Va. 685; 123 S. E. 795, 799. Under the absent voters' act the voter has no such opportunity or duty. His ballot leaves his control when mailed from a distant point. The ballot is authenticated and identified by the seal of the circuit court affixed by the circuit clerk and by his signature as such on the lower left-hand corner on the back. These rejected ballots are authenticated in that way as the law requires. No such

means of identification pertains to the ballot cast in person by the voter. The signature of the poll clerks would add little weight to the identification furnished by the seal and signature placed thereon by the circuit clerk. The reason for strict compliance is not so forceful as in the case of the voter who personally casts his ballot; and reason is the soul of any law. In *Morris* v. *Board of Canvassers,* 49 W. Va. 251, 262, Section 724 of McCrary on Elections is quoted with approval, which says: ''The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other, of relieving him from the consequences of a failure on the part of the election officers to perform their duties according to the letter of the statute, where such failure has not prevented à fair election. The justice of the rule is apparent, and it may be said to be the underlying principle to be applied in determining this question'' (of the mandatory or directory character of the Australian Election Law). The same text writer, in Section 538, in commenting upon the case of *Kirk* v. *Rhoads,* 46 Cal. 398, says: ''The court held, and we think upon the soundest reason, that as to those things over which the voter has control, the law is mandatory, and that as to such things as are not under his control it should be held to be directory only.'' And in *Pennington* v. *Hare,* 60 Minn. 150, it was held that those provisions of election laws which apply to the election officers over whose conduct the voter has no control should be construed as directory unless otherwise expressly or by necessary implication so declared by the statute. The same principle is set forth in *Doll* v. *Bender,* 55 W. Va. 404. Where the poll clerks have not signed a ballot delivered by them to a voter and it finds its way into the box we have by necessary implication held the failure to sign as a violation of a mandatory provision of the statute, for it says that such ballot shall be void and shall not be counted. As above pointed out, there is no such bristling and mandatory requirement in the absent voters' act. We have held in the *Senter case, supra,* that, although the statute requires in positive terms that the poll clerks shall personally sign their names in a *designated*

*place* on the back of the ballot *in ink,* that these provisions are merely directory. We are constrained to hold this requirement that the clerks shall sign the absent voter's ballot as directory. Like provisions in absent voters' law are held to be directory in *Glick* v. *Hunter* (Ind.), 129 N. E. 232; and in *State* v. *Barnett* (Wis. 1923), 195 N. W. 707, syl. 5 of which reads: "Failure of ballot clerks to indorse ballots of absent voters deposited in ballot box under St. 1921, sec. 11.62, did not affect validity of the ballots under section 6.41, making unindorsed ballots void; such statute not applying to absent voters." These four votes at City Hall, designated as Nos. 13, 14, 15 and 16, should have been counted for Bishop. This gives him a majority of votes. It would serve no useful purpose to consider and pass upon the other votes challenged by him, nor to determine whether the returns or ballots should have been adopted in the recount of East Williamson, War Eagle, Red Jacket and Double Lick precincts, at which Hatfield gained 8 votes by recounting the ballots.

Relators not having shown a clear right to the certificate of election showing *prima facie* right to the offices in question, the writs will be denied in each case.

*Writs denied.*