W. B. GIBSON

*v.*

CLARENCE O. BOWER, *et al.*

(No. 10508) .

Submitted September 17, 1952. Decided October 14, 1952.

HAYMOND, JUDGE, dissenting.

*Wm. Bruce Hoff, Lorentz C. Hamilton, Sr.,* for plaintiffs in error.

*Oliver D. Kessel, Stanley D'Orazio,* for defendant in error.

LOVINS, JUDGE:

By this proceeding instituted in the Circuit Court of Calhoun County, W. B. Gibson, petitioner, a candidate for

the Democratic nomination for commissioner of the County Court of Calhoun County at the primary election held on May 13, 1952, sought a writ of mandamus directing Clarence O. Bower, Foster Poling and Kenneth Hall, commissioners of the county court of that county, and as such, *ex officio*, the board of canvassers, defendants, hereinafter referred to as "board", to reconvene and to reject 117 ballots cast by absentee voters and counted by the board, for the reasons that, contrary to the requirements of Code, 3-6-5, none of such ballots had impressed thereon the official seal of the Clerk of the Circuit Court of Calhoun County, 85 of them had not been signed personally by such clerk, and two of them were not signed by the clerk, personally or otherwise; to reject 40 ballots cast by absentee voters and counted by the board, on the grounds that in some instances applications for such ballots were not made prior to delivery of the ballots to the voters, and that in some instances where such prior applications were made, they were not forthcoming within the period prescribed by statute; to reject 29 ballots, because they were sample ballots improperly used as official ballots; to reject one allegedly challenged ballot; and to make a proper certification showing the correct result of the election.

A writ of mandamus was granted by the circuit court on July 7, 1952, after a hearing, directing the board to reconvene and reject the 117 ballots cast by the absentee voters and the 29 sample ballots which had been cast as official ballots. The writ did not issue with reference to the 40 ballots for which petitioner contended there were no applications or such applications were not timely, or with reference to the one allegedly challenged ballot.

The board had theretofore declared Scott Duffield, the only opposing candidate, the Democratic nominee for county commissioner, the final result being 1181 votes for Duffield and 1169 votes for Gibson. The final order of the circuit court would change the result of the election so that Gibson would be credited with 1127 votes and Duf-

field with 1077 votes. From that order, the defendants bring this writ of error and supersedeas.

A demurrer to the original petition was sustained on the ground that Scott Duffield was a necessary and indispensable party, and overruled on other grounds which were later urged in a demurrer to the petition as amended. Gibson thereafter amended his petition to join Duffield as a defendant, the amended petition in other respects adopting the allegations of the original petition. The board then filed its demurrer to the petition, as amended, upon the principal ground that the petition, as amended, did not set forth facts authorizing the issuance of the writ; and upon other grounds unnecessary to mention or discuss.

A separate demurrer was filed by the defendant, Scott Duffield, assigning the same grounds. Both demurrers were overruled.

Two separate answers, admitting substantially all of the allegations of fact contained in the petition, as amended, except certain allegations dealing with the applications for the 40 absentee ballots, and a replication to each answer, were filed.

In what is termed a "cross petition", Duffield alleges that in the recount of the Democratic ballots, the board refused to consider five official ballots originally designed for use in Washington District, but lawfully and properly changed for use in Center District, and five sample ballots lawfully and properly changed for use as official ballots in the same manner as the sample ballots set forth in the petition. Duffield asked that, if the writ prayed for in the petition were issued, the board be compelled to count the ten rejected ballots.

By demurrer to the cross petition, Gibson contends that Duffield was not entitled to file a cross petition; that the counting or rejection of the ten ballots would not change the result of the election; and that the election officials of the precinct where such ballots were used had no authority to prepare such ballots for use. The demurrer to the cross petition was sustained.

It was established by the evidence that the official seal of the clerk of the circuit court had been omitted inadvertently from all of the 117 absentee ballots. 85 of those ballots contained the signatures of the clerk, S. R. Bee, and the Republican and Democratic ballot commissioners, but the signature of the clerk was not affixed by him personally. Mrs. Alice Marshall, a deputy clerk, had signed his name to some of those ballots, and Mrs. Beulah Bee, another deputy clerk, had signed the clerk's name to others. The clerk testified that both deputies had authority to sign his name to all papers issuing from his office, and that it was with his knowledge and approval, though such approval was not specifically given, that Mrs. Marshall and Mrs. Bee signed his name to the 85 ballots. Mrs. Marshall, an experienced deputy, whose service as such antedated by several years, the tenure of the present circuit clerk, testified that she had always considered that she had authority to sign the name of the clerk to all papers issuing from his office.

The name of the clerk, as affixed to the 85 ballots, appears simply as "S. R. Bee, Clerk", without any explanation following that it was signed by one of his deputies. On two of the 117 absentee ballots, the name of the clerk was not signed, but the names of the Republican and Democratic ballot commissioners were affixed to such ballots.

There were introduced 28 sample ballots, which were purportedly converted into official ballots by Mrs. Alice Marshall, deputy circuit clerk, for use in Precinct 6 in Center District in the late afternoon of the day of the election, and which were voted and counted in that precinct. The deputy clerk testified that the preparation of the sample ballots for use was done after information was received, at about 5:30 p. m., from the precinct election officials that there were no more official ballots for use in that precinct. No official ballots being on hand in the office of the clerk to supply the immediate need, Mrs. Marshall, on the advice of the prosecuting attorney of Calhoun County, effected certain changes in the sample

ballots in an effort to render them official. No attempt was made to communicate with the circuit clerk, or the other ballot commissioners. The lack of time prohibited the printing of additional ballots, and ballots were not available from other polling places for use in Precinct 6. On some of the 28 ballots, the printed words "Sample Ballot", were stricken by the drawing of two lines in blue ink through both words. On others, Mrs. Marshall said she left the word "Sample" unobliterated because the word appeared thereon over the name of one of the candidates. She wrote on all of the ballots either the words, "O.K. S. R. Bee, Circuit Clerk", or, "Ballot O.K., S. R. Bee, Circuit Clerk". In the voting of the ballots, the precinct poll clerks signed their names as required on official ballots.

Four ballots designed for use by absentee voters, and containing at the top the printed words, "Absentee Voter's Ballot", were voted and counted in Precinct 6 as official ballots, after having been changed in certain particulars. All four contained on their reverse side, written diagonally in red crayon, the words, "Sample Ballot". Two of them also have those words written in the same manner on the faces thereof. One ballot contained that writing across the face but an attempt had been made to erase the word "Sample".

Deputy Circuit Clerk Marshall testified that she had 900 Democratic official ballots printed for Center District. That number was not as many as had been printed in prior elections, but she explained that she was trying to economize, because there had always been a great number of ballots in excess of the actual need in previous elections. 380 of them were sent to Precinct 6.

The petition alleged that 14 ballots were delivered to absentee voters without prior applications having been made, which allegation is denied by the separate answers of the defendants. The petition further alleged that the applications of 26 persons, who were listed by name, were not made within the period prescribed by Code, 3-6-2, i.e., not sooner than 30 days or later than 10 days prior to the

election. 19 of those persons made their applications prematurely; five of them made application after May 3, 1952; and two applications were undated. The separate answers of the defendants admit that the applications filed after May 3, 1952, came too late, but controvert the dates alleged in the petition for the filing of applications of eight of the persons listed. Applications of the eight persons were exhibited at the hearing and substantiate the allegations of the petition. The ballots were not the subject of challenge, and no evidence was presented at the hearing to show for whom they were cast. The petition prayed that the 40 votes be rejected and that there be a reduction from the votes cast for each candidate by apportioning the loss occasioned by the rejection to each candidate according to the whole number of votes received by him, in the proper ratio. The petition then listed the precincts where the absentee votes were cast and the number cast for each candidate at each precinct. The lower court made no finding with respect to that question.

An attempt was made to show that the ballot of an absentee voter had been properly challenged, by the testimony of certain election officials of Precinct 6, but it was not established that a lawful challenge had been made. The final order here complained of made no determination on that contention.

Defendants contend that the lower court erred in its ruling on the pleadings, in admitting and considering improper evidence, and in rejecting proper evidence offered in behalf of defendants; and that the findings of the lower court are contrary to the law and evidence.

The record clearly shows that an insufficient supply of official ballots with which to conduct the primary election was delivered to the election officials at Precinct 6 in Center District. Code, 3-4-9, as amended by Chapter 49, Acts of the Legislature, Regular Session, 1943, provides that the ballot commissioners "shall cause official ballots, to not more than one and one-twentieth times the number of registered voters in each election precinct of each polit-

ical party, to be printed and delivered to them for holding the primary election". Code, 3-4-13, as amended by Chapter 44, Acts of the Legislature, Regular Session, 1941, requires the board of ballot commissioners to furnish to the election officials of each precinct ballots for each party "to the number of one and one-fifth times the number of registered voters of such party in the election precinct * * *". While the figures set forth in the foregoing sections are maximum limitations, rather than minimum requirements, it is obvious that the intendment of such legislation is not only to preclude the possibility of an oversupply of ballots but also to create an available surplus in the event of a shortage, created by loss, spoilation or destruction. The shortage in Precinct 6 occurred in the late afternoon of election day when many Democratic voters were demanding their right to vote or were expected to appear for that purpose before the closing of the polls. There is no showing of the number of registered Democratic voters in Precinct 6, so that we are unable to determine the ratio of ballots furnished by the ballot commissioners to the registration in that precinct. In the absence of evidence that a portion of the ballots delivered to the election officials were spoiled, lost, destroyed or misapplied, it is to be presumed that the available supply was exhausted in the normal process of voting. The shortage can therefore be accounted for only in the nonfeasance of the board of ballot commissioners to provide an adequate supply of ballots.

This court has said on several occasions that a voter should not be disfranchised merely because of irregularities attributable to officers of the election. *State ex rel. Hammond* v. *Hatfield*, 137 W. Va. 407, 71 S. E. 2d 807; *Hatfield* v. *Board of Canvassers*, 98 W. Va. 41, 126 S. E. 708; *Morris* v. *Board of Canvassers*, 49 W. Va. 251, 38 S. E. 500. "The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other of relieving him from the consequence of a failure on the part of election officers to perform their duties according

to the letter of the statute where such failure has not prevented a fair election." McCrary on Elections, Fourth Edition, §724.

Was the voting of 28 ballots, originally printed as sample ballots, and 4, originally printed as absentee ballots, valid?

Code, 3-4-9, as amended, requires the preparation and publication of a "sample official primary ballot". Code, 3-4-11, provides that such ballots shall be of the same color of paper as the official ballots but "there shall be printed across the face of such sample ballot in large letters the words 'sample ballot,' and no sample ballot shall be voted or counted". Code, 3-4-12, as amended by Chapter 48, Acts of the Legislature, Regular Session, 1943, provides that "sample ballots shall be in the same form as the official ballot, but the order of the names thereon need not be alternated." Code, 3-4-14, prescribes the method for obtaining a new supply of ballots where the original supply is lost or destroyed by accident or other casualty. That section requires that the loss shall be reported to the board of ballot commissioners or the clerk of the court from whom the ballots were obtained, and that an affidavit of the circumstances of the loss shall be made; "whereupon such board or clerk shall at once send a new supply * * *".

The prohibition set forth in Code, 3-4-11, that sample ballots shall not be voted or counted, is salutary in purpose, and is mandatory. It is conceivable that if such were not the law, an opportunity would exist for fraud at the polls by persons desiring to manipulate an election. But we are of the opinion that in the instant case the ballots which were printed originally as sample ballots attained the character of official ballots after the careful changes made on the face thereof by the deputy circuit clerk. Application for an additional supply of ballots was made in the office of the circuit clerk, who was, *ex officio*, chairman of the board of ballot commissioners. In the absence of the circuit clerk, his deputy, on the advice of the prose-

cuting attorney, revised the sample ballots by striking from them their designation as such and noting on the face of each ballot the approval of the circuit clerk. Although prior express authority to sign his name was not given by the clerk to his deputy, the clerk testified that the deputy had authority to sign his name to all papers issuing from his office, and he confirmed at the hearing in this proceeding the actions of his deputy. The action which the deputy clerk took on behalf of her principal was not the preparation and furnishing of ballots in the first instance, which is the province of the ballot commissioners, under Code, 3-4-9, as amended, but was merely the furnishing of an additional supply of ballots when a shortage in the original supply had occurred. In the voting of the converted ballots at Precinct 6, the poll clerks signed them as is done in the case of official ballots. There was therefore the participation of the circuit clerk, through his deputy, the precinct election officials and the voters who used the ballots. There is no contention or showing of fraud.

There was no invalidity in the voting of the four ballots which contained at the top thereof the printed words "absentee voter's ballot." Code, 3-6-14, 15, provide that absentee voters' ballots shall be, in form, like all others. We do not regard the quoted words as a sufficient mark or identification to impair their secrecy, and hence we see no cause for their rejection.

The election officers in Precinct 6, Center District, faced a problem, the solution of which required some action on their part. In the absence of such action, legally qualified voters would have been deprived of their right of suffrage. All the authorities we have examined disapprove such a result. We do not approve irregularity in the election process, but rather than deprive voters of an important and vital right, we think it is sound law to view with leniency the irregularity involved here in obtaining additional ballots in Precinct 6, Center District. Especially is this true when no fraud, illegal voting or other misconduct is disclosed, as in this instance.

472

The question as to the validity of the 117 absentee ballots has been resolved by a former decision of this court. In *State ex rel. Hammond* v. *Hatfield, supra,* this court held directory that portion of Code, 3-6-5, which reads: "Before any ballot is mailed or delivered, the clerk shall affix his official seal and he and other members of the board * * * shall place their signatures near the lower left hand corner of the back thereof." See *Hatfield* v. *Board of Canvassers, supra.* In the instant case, the fact that 87 of the absentee ballots contain the signatures of two of the ballot commissioners and the remaining 30 contain the signatures of all three ballot commissioners constitutes substantial compliance with the terms of Code, 3-6-5, without the presence of the clerk's seal.

The trial court did not err in sustaining a demurrer to the cross petition filed in this proceeding. The pleadings available to a defendant, in mandamus are clearly set forth in Chapter 26, Article 1, Section 6, Acts of the Legislature, Regular Session, 1933. We have been cited to no authority, nor have we found any, which would justify the filing of a cross petition for affirmative relief upon the rule issued at the instance of a relator. Moreover, defendant Duffield, being the prevailing party in the final canvass of the election and showing nothing by his cross petition which would change the result of the election, does not establish a clear right to the relief which he seeks, and, therefore, his petition, considered independently, would fail. *State ex rel. Daily Gazette Co.* v. *County Court,* 137 W. Va. 127, 70 S. E. 2d 260; *State ex rel. Conley* v. *Pennybacker,* 131 W. Va. 442, 48 S. E. 2d 9.

Being of the opinion that the law does not justify, and the proof does not support, the issuance of a writ of mandamus, and that there was error in the granting of the same, it is unnecessary to discuss other specific assignments of error. The order of the circuit court is reversed.

*Reversed.*

HAYMOND, JUDGE, dissenting:

I respectfully but emphatically dissent from the holding by the majority of the Court that the 28 ballots which were prepared as sample ballots were converted into official ballots by the deputy circuit clerk by the acts of that official mentioned in the opinion and that such ballots, having by such acts become official ballots, were properly cast at the primary election held at Precinct No. 6 in Center District in Calhoun County. I can not concur in the reasoning which leads to that magic and surprising result and which, in my judgment, is utterly unsound.

In the opinion in the recent case of *Evans* v. *Charles,* 133 W. Va. 463, 56 S. E. 2d 880, this Court said: "The system of elections in this State is not of common law origin; and the exercise of the right of suffrage is regulated and controlled by constitutional and statutory provisions. *State ex rel. Robertson* v. *County Court of Kanawha County,* 131 W. Va. 521, 48 S. E. 2d 345. The manner of conducting elections in this State is governed by statutes and the power of the Legislature to deal with elections is plenary except to the extent that it is limited by the provisions of the Constitution of this State or of the Constitution of the United States. *State ex rel. Forsythe* v. *County Court of Cabell County,* 131 W. Va. 570, 48 S. E. 2d 412; *Halstead* v. *Rader,* 27 W. Va. 806." See also *State ex rel. Lockhart* v. *Rogers,* 134 W. Va. 470, 61 S. E. 2d 258; 18 Am. Jur., Elections, Section 2.

Section 2, Article 5, Chapter 3, Code, 1931, provides in part that in each county the clerk of the circuit court and two persons appointed by him, for a term of two years, one from each of the two major political parties, shall constitute a board of ballot commissioners of which the clerk shall be chairman; and that the members of the board shall perform the duties of such commissioners at all general, special and primary elections held in the county or in any magisterial district during their term of office. Section 3 of the same article and chapter in part contains this language: "It shall be the duty of the board

of ballot commissioners for each county to provide printed ballots for every election for public officers in which the voters or any of the voters within the county participate, and cause to be printed, on the appropriate ballot, the name of every candidate whose name has been certified to or filed with the clerk of the circuit court of the county in any manner provided for in this chapter. * * *. Ballots other than those caused to be printed by the respective boards of ballot commissioners, according to the provisions of this chapter, shall not be cast, received, or counted in any election."

Section 9, Article 4, Chapter 3, Code, 1931, as amended, provides that the ballot commissioners of each county shall, at least twenty five days before the holding of any primary election, prepare a sample official primary ballot for each party and for non-partisan candidates and cause such ballot to be published in the manner provided by the section; and that the ballot commissioners "shall cause official ballots, to not more than one and one-twentieth times the number of registered voters in each election precinct of each political party, to be printed and delivered to them for holding the primary election." Section 11 of the same article and chapter in part provides that the same color of paper selected and designated by the secretary of state for any party shall be used for sample ballots of such party; that there shall be printed across the face of such sample ballot in large letters the words "sample ballot", and that no sample ballot shall be voted or counted.

It is conceded that the 28 ballots were originally prepared as sample ballots. The deputy whose acts effected the amazing conversion of the ballots was not even a member of the board of ballot commissioners, the only agency authorized by law to prepare any ballots for use in connection with the primary election. When the deputy undertook to change the sample ballots into official ballots neither the clerk nor any one of the other two members of the board of ballot commissioners which could function officially only as a unit, by unanimous or major-

ity action, was even present. In the absence of all the members of the board, the only agency which could legally prepare an official ballot, the deputy, not a member of the board, undertook to make the conversion. Neither the clerk himself nor any other member of the board, acting singly, could legally do what the deputy endeavored to do. Manifestly the deputy alone could not perform a duty which the statute imposes upon the board and which could be performed only by action of at least a majority of its members. In attempting to prepare official ballots by placing her approval on sample ballots the deputy endeavored to perform an act which only the board could lawfully perform. If she could make official ballots out of sample ballots, by her mere approval of sample ballots, and thus in fact prepare official ballots, she could discharge any other function of the board and by so usurping its authority in all such matters render its existence unnecessary.

I assume that it would not be seriously contended by the most zealous advocate that the approval, by the county clerk, the assessor, the sheriff, the prosecuting attorney or any other elective county officer, or a county employee or a stranger, of sample ballots could lawfully convert them into official ballots, or that any such contention would be considered effective for that purpose by the majority of the court, for manifestly none of the designated county officers is vested with any legal authority to prepare ballots for use in an election; yet by the decision of the majority, the deputy, who is not a member of the board of ballot commissioners and is as completely without authority to act for it as any of the officers just mentioned or a stranger could possibly be, is enabled to convert sample ballots into official ballots by her mere approval. The signatures of the poll clerks at the precinct upon the sample ballots, likewise, did not change them into official ballots. If acts of the poll clerks could produce that result sample ballots, or any kind of ballots, could be used in lieu of official ballots in violation of the express provision of the statute, Code, 1931, 3-4-11, which

forbids the voting or the counting of sample ballots and which the majority says is "salutary in purpose" and mandatory in character.

In my judgment the sample ballots, notwithstanding the approval of the deputy and the signatures of the poll clerks, all of which was wholly without authority of law, remained sample ballots, and the action of the majority in holding them to be official ballots disregards the command of the statute, operates to defeat its purpose, and opens the door to fraud and dishonesty in elections. I am disposed to go a long way to preserve and make effective the right of franchise of the qualified voter, but that right is subject to, and not beyond, constitutional and statutory provisions designed to safeguard and secure fair and honest elections. When voters and election officials, or any of them, fail to comply with the requirements of mandatory statutes which govern elections, the lesser of two evils is the denial of the right of few or even many voters to vote rather than the impairment or the destruction of the system by which fair and honest elections may be safeguarded and secured.

It is true, as pointed out by the majority, that no fraud attended the action of the deputy in attempting to convert the sample ballots into official ballots. That action was thoroughly honest and was undertaken with the utmost good faith. Though well intended it was, nonetheless, entirely unauthorized and, in consequence, legally ineffective. The majority recognizes it as authorized and valid. It is significant, however, that in so doing the majority fails to indicate the source, statutory or judicial, of the authority of the deputy to convert sample ballots into official ballots, or to justify such action by any statutory provision or by any applicable judicial pronouncement. Though no fraud attended or tainted the action of the deputy or the holding of the election, the mere absence of fraud from official conduct does not and can not confer authority to engage in or perform such conduct. Authority to hold and conduct elections under our present system is based upon, and is solely derived from, constitutional

and statutory provisions, and acts and conduct not authorized by such provisions, however well intended, can not be validly or legally performed. In my opinion, the holding of the majority in justifying and sustaining as valid wholly unauthorized action, because it was not attended by fraud, in fact will tend to facilitate fraud and dishonesty which the statute, in forbidding the voting or the counting of sample ballots, was designed to prevent.

For the foregoing reasons, I would reject all such ballots and refuse to permit them to be voted or counted in the primary election.