STATE OF WEST VIRGINIA *ex rel.* HERBERT TRAUBERT

*v.*

LYLE VIRDEN, *et al.*, COMMISSIONERS OF THE COUNTY COURT OF HANCOCK COUNTY, AND WILLIAM TOMPOS

(No. 12040)

Submitted June 21, 1960.          Decided July 6, 1960.

*Pinsky, Mahan & Barnes,* for relator.

*Frank A. Pietranton,* Prosecuting Attorney, *Donell & Tarr,* for respondents.

GIVEN, JUDGE:

This original proceeding in mandamus, instituted by Herbert Traubert against Lyle Virden, William Graham and David Thomas, commissioners of the County Court of Hancock County, and as such, ex officio The Board of Canvassers of Hancock County, and William Tompos, is prosecuted for the purpose of requiring the board of canvassers to elminate from the official count two hundred ninety five allegedly sample ballots voted in precincts 13, 14 and 15 of Clay District, Hancock County, at the primary election held on the 10th day of May, 1960, for the nomination of a candidate for the office of State Senator for the First Senatorial District, consisting of Hancock, Brooke and Ohio Counties. The matter was heard on the petition of relator, the answer of defendants, the demurrer of relator to the answer, a stipulation of facts with exhibits filed therewith, and on briefs and oral arguments of the respective parties.

At the primary election mentioned there were three candidates for the democratic nomination for the office of State Senator, First Senatorial District, the relator, William Tompos and Donald Chaney. The stipulation mentioned discloses that whether relator or defendant Tompos was nominated depends on

whether the two hundred ninety five questioned ballots, found in precincts 13, 14 and 15, are counted. If the two hundred ninety five ballots are counted, Tompos will be entitled to be certified as the nominee, with a total vote, in the three counties, of 10,959, while relator's total vote, in the three counties, would be 10,878. If the two hundred ninety five ballots are eliminated from the official count, the total vote for relator, in the three counties, will be 10,824, and the total vote for Tompos, in the three counties, will be 10,801. The other candidate, Chaney, received a much lesser vote. The board of canvassers, after certain precincts had been recounted, on demand of relator, and after relator had withdrawn such demand as to all other precincts, counted the two hundred ninety five questioned ballots. Fifty four of such ballots were counted for Traubert, one hundred fifty eight for Tompos, and eighty three for Chaney. As indicated, the elimination of the count of two hundred ninety five ballots would result in the nomination of relator.

The controlling question as to whether the two hundred ninety five ballots should be counted is common, in all respects, as to each of the two hundred ninety five questioned ballots. Exhibited as part of the stipulation is a ballot, designated Exhibit A, which is agreed to be truly representative of the two hundred ninety five questioned ballots. There is also made part of the stipulation, as Exhibit B, an admittedly "official ballot" of the Democratic Party as printed and used at the primary election. Exhibit C, with the stipulation, is admittedly a "sample ballot" as printed and used as such at the primary. It is agreed that such exhibits correctly portray the type of ballots which they purport to represent.

Exhibit A, the questioned ballot, is precisely like the official ballot in printing, texture, color, size and language, and in all other substantial respects, except that it has printed in the top margin or caption, as the first words in the printing, in small capitals, the words "sample ballots", which words are printed

immediately before the words, in much larger type, "The Democratic Party". Printed on Exhibit B, the admittedly official ballot, in the same position as the words "sample ballots" are printed on Exhibit A, are the words "official ballot of". On the reverse side of Exhibit A the words and printing are "official ballot", in large type, the words "May 10, 1960", in small type, followed by two blank lines, with the words "poll clerks". On the reverse side of Exhibit B the words and printing are "official ballot", in large type, the words "primary election May 10, 1960", followed by two blank lines, with the words "poll clerks". Exhibit C, correctly representing the true sample ballots printed and used at such primary, is of the same size as Exhibits A and B, apparently of the same quality and weight of paper, but of an entirely different color, Exhibits A and B being of a pink color, while Exhibit C is of a yellow color. Exhibit C has printed in the top margin, in the same position and size type as on Exhibit A, the words, "sample ballots". In addition, however, Exhibit C has printed diagonally across the face thereof, touching or crossing each column, in black type much larger than any other on the exhibit, the words "sample ballot". There is no printing on the reverse side of Exhibit C.

The two hundred ninety five questioned ballots were printed by the printer who was selected by the ballot commissioners and who printed the official and sample ballots, and were delivered by the printer to the ballot commissioners, and were delivered by the ballot commissioners to the precinct election officials, as required by statutes. The error in the printing appearing on the questioned ballots was not discovered until some time, not definitely shown, after the opening of the polls, and allegedly too late to obtain other ballots. Upon discovery of the error the Clerk of the Circuit Court of Hancock County, ex officio member of the board of ballot commissioners, was notified, and an affidavit, approved by him, was made by the precinct election officials, to the effect that the Clerk of the

Circuit Court of Hancock County had approved the use of the questioned ballots, "since it is impossible to obtain Democrat Party primary ballots marked 'Official Ballot' at this late time, inasmuch as the error was not discovered until too late to have new ballots printed". There is no contention that any fraud existed, or that there was intentional wrongdoing on the part of any person.

The propositions facing the Court are two: (1) Must the questioned ballots be classified and treated as sample ballots, or (2) if originally sample ballots, within the meaning of the statute, should they be counted as official ballots in view of the unusual circumstances attending their use, or in view of the consideration given them by the precinct election officials and the one member of the board of ballot commissioners? We reach only the first question.

Code, 3-4-11, reads: "There shall be a separate ballot printed on different colored paper, for each political party participating in the primary election, and the ballot of no two parties shall be of the same color or tint. The secretary of state shall select and determine the color of the paper of the ballot of each of the parties, and shall notify the clerk of the circuit court of each county thereof, at the time he certifies the names of the candidates of the various parties to said clerk, as herein provided.

"The same color of paper selected and designated by the secretary of state for any party shall also be used for sample ballots of such party; but there shall be printed across the face of such sample ballot in large letters the words 'sample ballot,' and no sample ballot shall be voted or counted." Section 12 of the same article, as amended, contains these provisions: "* * * After the ballots are printed they shall be kept in separate piles, one pile for each change in position, and shall then be gathered by taking one from each pile. Sample ballots shall be in the same form as the official ballot, but the order of the names thereon need not be alternated.

"All ballots used in primary elections shall be printed on paper conforming as nearly as practicable in weight, texture, and color to the samples furnished by the secretary of state, and the paper shall be sufficiently thick so that the printing cannot be discernible from the back. On the back of the ballot shall be printed in black ink, and in plain, legible, black face pica type, the name of the political party as contained in the heading or 'Nonpartisan Board of Education', as the case may be, followed by the word 'ballot'. Under this designation shall be printed two blank lines, followed by the words 'poll clerks' ''".

In *Gibson v. Bower,* 137 W. Va. 462, 73 S. E. 2d 817, we held that the statutory provision that "no sample ballot shall be voted or counted" is mandatory. In that case the questioned ballots were originally prepared and printed as sample ballots. There was no contention that the questioned ballots were not in substantial form with the statutory requirements or description of sample ballots. In the instant case, almost the opposite is true. The questioned ballots conform with all substantial requirements of the official ballots, unless the irregular printing of the words "sample ballots" in the top margin constitutes a controlling departure therefrom. The words "official ballot", as pointed out, are printed on the reverse side thereof. They differed in very substantial respects from the true sample ballot, Exhibit C, in that they did not have printed across the face thereof, in large letters, the words "sample ballot"; in that they were of a distinctly different color from Exhibit C as "selected and designated by the secretary of state"; and in that there was printed, on the reverse side thereof, the printing required to be on the official ballots, but which was not printed on Exhibit C. Though the names of candidates were not required by statute to be rotated or changed as to position on sample ballots, as is required by Code, 3-4-12, as amended, on official ballots, the names of candidates were so rotated on the questioned ballots.

Moreover, in the instant case the questioned ballots were printed and delivered to the precinct election officials as official ballots, not sample ballots, and were included in the number of official ballots required to be delivered to the respective precincts; and the irregularity in the printing was not discovered until after some of such ballots were voted, and, admittedly, no fraud or possibility of fraud or intentional wrong-doing of any person is shown. The questioned ballots were packaged with the official ballots and were delivered to and remained in the custody of the board of ballot commissioners from the time so received until delivered to the precinct election officials. We think it clear, therefore, that the two hundred ninety five questioned ballots are not, within the meaning of the statute, sample ballots, and must be counted as voted. Though containing the one irregularity they were, in fact, official ballots.

In *Gibson v. Bower, supra,* the validity and counting of four absentee ballots, with the words "absentee voter's ballot" printed at the top of the ballots were considered by the Court. Code, 3-6-14, requires that "The ballot or ballots, to be delivered to and marked by any absent voter, shall be of the regular official type of ballot to be used at such election." Code, 3-6-15, requires that "Absent voters' ballots shall be in all respects like other ballots". Notwithstanding the irregularity in printing at the top of the ballots the words "absentee voter's ballot", the Court stated: "There was no invalidity in the voting of the four ballots which contained at the top thereof the printed words 'absentee voter's ballot'. Code, 3-6-14, 15, provide that absentee voters' ballots shall be, in form, like all others. We do not regard the quoted words as a sufficient mark or identification to impair their secrecy, and hence we see no cause for their rejection." Though the printing of such ballots may have been irregular, different from the official ballots, that fact did not destroy their true character or preclude the counting of such ballots. In the instant proceeding,

though the provision of the statute requiring that no sample ballot be counted is mandatory, that fact does not preclude the Court from determining the true character of the two hundred ninety five questioned ballots. Also, the conclusion reached herein is, we think, in accord with a long line of decisions refusing to disfranchise voters unless mandatorily required to do so. See *State ex rel. Hammond v. Hatfield, Mayor,* 137 W. Va. 407, 71 S. E. 2d 807; *McCoy v. Fisher,* 136 W. Va. 447, 67 S. E. 2d 543; *State ex rel. Bumgardner v. Mills,* 132 W. Va. 580, 53 S. E. 2d 416; *Doll v. Bender,* 55 W. Va. 404, 47 S. E. 293; *Daniel v. Simms,* 49 W. Va. 554, 39 S. E. 690. Code 3-5-19, as amended.

From the conclusions reached, it necessarily follows that the rule issued herein must be discharged, and the writ of mandamus prayed for denied.

*Write denied.*