Pierce B. Maynard

*v.*

Henry T. Hammond

(No. 10638)

Submitted November 17, 1953. Decided December 21, 1953.

*H. G. Williamson, Bronson & Bronson, John F. Bronson,* for plaintiff in error.

*J. Brooks Lawson,* for defendant in error.

232

BROWNING, JUDGE:

On June 10, 1952, in accordance with the provisions of the special charter of the City of Williamson, the municipal election was held at which a mayor and four councilmen of each major political party were candidates. Two candidates of the republican party were elected to the council, and two candidates of the democratic party were elected to that body, but since that time, the contestant Maynard, democrat, and the contestee Hammond, republican, have engaged in litigation to determine who was elected to the office of mayor. The initial returns from the precincts on election day favored Hammond by eight votes. Two days later, on June 12, 1952, the mayor and council of the City of Williamson, sitting as a canvassing board, by authority vested in it by Chapter 136, Section 11, Acts of the Legislature, 1933, and ordinances, canvassed the votes and determined that Maynard had received 1,983 votes and Hammond 1,971 votes. Upon a recount of the votes cast at the election, by the mayor and members of the council sitting as a canvassing board, the board determined that Maynard had received 1,962 votes and Hammond 1,949 votes. The recount occurred on June 13, 16, 17 and 24, 1952. The board of canvassers employed an official reporter to take down and transcribe the proceedings before it upon the recount, and upon taking the necessary oath of office, her certificate states that she did proceed to perform her official duties as such reporter. Subsequent to the recount, the contestant took the oath of office as mayor of the City of Williamson, and assumed office on July 1, 1952.

On July 2, 1952, upon petition by the contestee, a rule in mandamus was granted by this Court against those persons comprising the canvassing board, and Melba Hatfield, the Clerk of the City of Williamson, commanding them to show cause why the board of canvassers should not reconvene and count certain ballots for Hammond allegedly wrongfully counted for Maynard on the recount; count for Hammond certain ballots not counted for either party; and to reject and not count for either party certain

ballots allegedly wrongfully counted for Maynard. A motion was also made by counsel for Hammond that certain disputed ballots be photostated so that counsel might be furnished copies thereof for the purpose of preparing their briefs, prior to July 8, 1952, which was the return day of the rule. This Court granted the motion and directed its clerk to have the 48 disputed ballots photostated, which was done under circumstances which will be hereafter related.

This Court, on July 12, 1952, entered an order awarding the writ of mandamus prayed for, directing the board of canvassers to reconvene and issue a certificate of election to Hammond upon a finding that he had received in the election 1,963 votes, and Maynard 1,961 votes. On July 18, 1952, Hammond took office as mayor.

On July 28, 1952, contestant served notice upon the contestee that he would, before the mayor and city council of Williamson, sitting as a contest court, contest the election of the contestee upon the grounds that: Fraud and irregularities had occurred at Precinct No. 4, City Hall and that all votes cast at that precinct should be disregarded and not considered in determining the result of the election; and upon the further ground that 6 ballots, Ballot No. 2, Precinct No. 1, Ballot No. 3, Precinct No. 3, Ballot No. 4, Precinct No. 3, Ballot No. 3, Precinct No. 8, Ballot No. 8, Precinct No. 9 and Ballot No. 9, Precinct No. 9 had been fraudulently altered and forged subsequent to the recount, and that these ballots should be counted for Maynard in accordance with the original wishes of the voters who cast them.

Hammond, on August 6, 1952, served upon Maynard, and filed with the city clerk, a counter-notice which stated that the contestee would seek to have all of the votes cast at Precinct No. 6, High School, disregarded and not counted for either candidate upon the ground that the person appointed therein to act as commissioner had acted as poll clerk, signing each and every ballot as such, and that 4 absentee ballots cast at Precinct No. 3 for the

contestee, which had been rejected and not counted, should be counted for him.

On August 22, 1952, the contestant filed with the contest court an amended notice of contest, which was not served upon the contestee, containing, in addition to the names of 147 persons alleged in his notice to have voted for the contestant at City Hall, Precinct No. 4, the following: "Numerous other people voted for me at said election at said precinct which were not counted and included by the commissioner holding said election."

The contest court, on August 26, 1952, sustained the contestee's demurrer to the contestant's notice, and dismissed the contest. However, on September 30, 1952, the Circuit Court of Mingo County reversed the action of the contest court, and remanded the contest for further proceedings.

On November 24, 1952, this Court refused the request of contestee for a writ of error to the ruling of the circuit court. The contest court proceeded to hear the contest upon its merits, and held numerous sessions for that purpose between December 27, 1952 and April 16, 1953.

On June 26, 1953, the contest court refused to disturb the vote at Precinct No. 4, and refused the relief sought by contestant with regard to the 6 allegedly forged ballots, and granted the relief sought by the contestee by finding that no valid votes were cast at Precinct No. 6 because the person appointed as election commissioner had signed all of the ballots cast at that precinct, and ordered that the 4 absentee ballots in dispute at Precinct No. 3 should be counted for Hammond. One of the votes cast at Precinct No. 6 was an absentee ballot for Maynard, and it was conceded that it should be properly counted for Maynard. It was not contended by either party in the contest proceeding that the remaining 42 votes which had been in dispute before this Court in *State ex rel. Hammond* v. *Hatfield, Mayor, et al.,* 137 W. Va. 407, 71 S. E. 2d 807, should be counted otherwise than this Court had held that they should be in that case. As a result

of the decision of the contest court, Hammond was declared to have received a total of 1,966 votes and Maynard 1,957 votes.

The contestant was granted an appeal by the Circuit Court of Mingo County, on June 30, 1953, from the decision of the contest court, and on July 13, 1953, Judge Charles W. Ferguson disqualified himself, and voluntarily withdrew from the case. Judge John W. Hereford of the Sixth Judicial Circuit, by arrangement, thereafter presided in the case. In a written memorandum opinion confirmed by subsequent order, Judge Hereford reversed the action of the contest court with regard to Precinct No. 6, holding that all votes cast there were valid, and as to the absentee ballots in Precinct No. 3, held that they could not be counted, inasmuch as the action of this Court in *State ex rel. Hammond* v. *Hatfield, Mayor, et al., supra*, relative to them was *res adjudicata*. The Circuit Court of Mingo County affirmed the action of the contest court with regard to City Hall Precinct No. 4, and the 6 allegedly forged ballots. This action by that court placed the contestant and contestee in the identical positions they had held after the decision of this Court in *State ex rel. Hammond* v. *Hatfield, Mayor, et al., supra*, to-wit, Hammond had 1,963 votes and Maynard 1,961 votes.

On October 26, 1953, this Court granted a writ of error to the final order of the Circuit Court of Mingo County, entered on October 1, 1953, the contestant assigning as error the holding of the Circuit Court of Mingo County that no fraudulent conduct had been shown as to Precinct No. 4 to justify disregarding the votes at that precinct, and for sustaining the contest court upon the question of the 6 allegedly forged ballots. Under Rule XI of this Court, the contestee, and defendant in error, filed a counter-assignment of error to the action of the circuit court in reversing the contest court's ruling as to Precinct No. 6 and the 4 absentee ballots.

The questions raised by the assignment, and counter-assignment of error will be discussed in this order: (1)

Precinct No. 4, City Hall; (2) Precinct No. 6; (3) the absentee ballots cast in Precinct No. 3; and (4) the 6 allegedly forged ballots.

At Precinct No. 4, City Hall, the contestant received 113 votes and the contestee 251 votes. In his notice of contest, the contestant listed the names of 147 people that he alleged voted for him at that precinct. In his amended notice of contest, he alleged, as heretofore stated, that in addition to the 147 votes, numerous other persons voted for him at that precinct. The amended notice was not served upon the contestee, and objection was made to the testimony of any witnesses other than the 147 named. At the trial before the contest court, the contestant produced 97 witnesses who, waiving the right of secrecy of their ballots, testified that they voted for Maynard. The contestant produced 22 other persons whose names were not listed on the original notice of contest, and the contest court ruled that such testimony was inadmissible, but the record shows avowals that these 22, if permitted to do so, would have testified that they voted for Maynard at Precinct No. 4. The contestant further produced and offered as evidence 50 affidavits alleged to have been made by persons who voted at Precinct No. 4, and stating that affiants voted for Maynard. The affidavits were likewise refused as evidence by the contest court. In *Duncan v. County Court of Cabell County, et al.,* 138 W. Va. 106, 75 S. E. 2d. 97, decided March 24, 1953, this Court held that: "Ex parte affidavits of voters who voted in a certain precinct filed in a recount, are not competent to contradict the number of votes cast in such precinct as shown by the sole voting machine used therein." Though the question therein presented had arisen upon a canvass and recount, not a contest, the contest court and the Circuit Court of Mingo County correctly held that the affidavits were inadmissible, and likewise the avowals, particularly in view of the fact that the amended notice had not been served upon the contestee.

In regard to the question of whether a voter, subse-

quent to the casting of his vote at an election, may, by waiving his right of secrecy of the ballot, testify for whom he voted in an election, there is a definite conflict of authority. 29 C.J.S., Elections, §281, and cases cited therein. This Court has not passed directly upon this question, and, since, by the elimination of the 50 affidavits and 22 avowals, the contestant has failed to show that as many as 113 persons voted for him at Precinct No. 4, it is unnecessary to do so in this case. As to contestant's charge that 3 or 4 persons, shown by the poll book to have voted, did not in fact cast their vote in the election, Code, 3-9-14, provides: "Though illegal votes be received, or legal votes be rejected, at any place of voting, the returns of the votes taken at such place shall not be set aside for that cause, but it may be shown, by proper evidence before the tribunal authorized by law to hear and determine contested elections, for whom such illegal votes or any of them were cast, or for whom the legal votes which were rejected would have been given, and the returns shall be corrected only to the extent that it is so shown." There was no showing by contestant for whom such illegal votes, if such they were, or any of them were cast.

There was testimony also in the attack upon the City Hall precinct as to persons improperly being inside the voting place while the polls were open. Two witnesses testified that Hammond was in the precinct on three or four occasions during the day; that E. Gaujot Bias, his campaign manager, was likewise there illegally; and that one Taylor, apparently also a partisan of Hammond, had been "in and out of the polls" all day. All of this testimony was specifically denied by the election officers, and the contestant's witnesses did not state that any of these persons did any fraudulent act, or that they were observed doing anything that might have affected the result of the voting at that place. Those charged with being improperly in the voting place likewise denied the charges of contestant's witnesses. Contestant attempted to cast further doubt upon the legality of the returns from Precinct No. 4 by showing that while he received 113 votes

and his republican opponent received 251 votes at that precinct, that the democratic candidate for councilman received 238 votes at that precinct, while his republican opponent received 127 votes. The burden was upon contestant to prove by a preponderance of the evidence that the election in Precinct No. 4 was so fraudulently conducted that the entire vote cast there should not be considered. He failed to meet that requirement, and the contest court and the Circuit Court of Mingo County properly so held.

This Court has on numerous occasions held that the statutory provisions, requiring poll clerks to personally sign all ballots, are mandatory, and that all ballots which are not signed by the poll clerks in the manner required by statute are void and cannot be considered or counted. Code, 3-5-31, reads in part as follows: "* * * Any ballot which is not indorsed with the names of the poll clerks, as provided in this chapter, shall be void and shall not be counted; * * *." Code, 3-5-18, provides: "* * * each poll clerk shall personally sign his name on the back of the ballot before delivering it to the voter. * * *" *State ex rel. Bumgardner* v. *Mills, et al,* 132 W. Va. 580, 53 S. E. 2d. 416; *Funkhouser* v. *Brotherton, et al.,* 124 W. Va. 713, 22 S. E. 2d 234; *State ex rel. Johnson* v. *Given,* 102 W. Va. 703, 136 S. E. 771; and numerous other cases cited in the *Mills* case.

The precice question here presented has. not heretofore been before this Court. Contestee alleged in his counternotice that Glen E. Farrar was duly appointed commissioner of election, and that James McQueen was duly appointed poll clerk for Precinct No. 6, but that Farrar signed all of the ballots cast at that precinct as poll clerk. The only evidence adduced by contestee to support his contention that the mandatory statutory provisions requiring that the poll clerk shall personally sign all ballots was given by Sam Cantees, Clerk of the City of Williamson. He stated that James McQueen was appointed poll clerk for Precinct No. 6. By agreement of counsel, the certificate of results of Precinct No. 6 was

made a part of this record during the contest proceedings, and is marked Contestant's Exhibit No. A-6. That certificate was signed by Glen E. Farrar as poll clerk, and by James McQueen as commissioner. There is no evidence to show, nor denial in contestee's brief, that these men did not qualify for the respective positions they filled by taking the required oaths of office, and by the allegation in contestee's counternotice that Farrar signed all ballots at Precinct No. 6, it must be taken as admitted that he, and he alone, served throughout the election as poll clerk. This case is clearly distinguishable from *Johnson* v. *Given, supra,* wherein the counting clerk and not the receiving or poll clerk signed all of the ballots. It may be distinguished also from the other cases cited where a poll clerk "designated" some other officer to sign his name to the ballots. In *Funkhouser* v. *Brotherton, et al, supra,* a situation similar to, but not identical with, the present one developed. The Court said: "The testimony further shows without question that, at the opening of the polls at this precinct, Zundel Hark, who had been appointed by the county court as Republican clerk, failed to appear, and that thereupon, the remaining officials there present appointed Mulligan Chappell to act as clerk in lieu of Hark, and chose Robert Humphreys, a Republican voter then present, to be commissioner in the stead of Chappell. The clerk's oath in the Republican poll book contains the name of Mulligan Chappell in what appears to be the same handwriting by which he signs the certificate of election, but inserted in the same manner as that of Homer H. Lowe. This oath is not signed by Chappell at its close, but his name, oddly, appears in the blank for the signature of the attesting officer. All witnesses agree that Chappell, from the opening of the polls, proceeded to act as Republican receiving clerk, and, although absenting himself at times, continued as such clerk until four or four-thirty o'clock in the afternoon, after which his absence continued until the closing of the polls. We are of opinion that this showing clearly establishes that Mulligan Chappell was legally chosen and qualified, and that he did act as Republican receiving clerk at this pre-

cinct." The vote between contestant and contestee was close at this precinct, the former receiving 220 votes, and the latter 215 votes. There is neither evidence nor allegations of fraud or other misconduct at this precinct. The circuit court correctly held that Farrar was the *de jure* poll clerk at Precinct No. 6, and that the voters of that precinct should not be disfranchised upon the circumstances shown by this record.

The four absentee ballots were marked by voters of Precinct No. 3 at the City Hall prior to election day, were received by the election officers on election day in one of the ballot boxes, and properly preserved as provided by statute. The evidence shows that the election officials, prior to opening the polls, removed these 4 absentee ballots, "examined the credentials" of the absentee voters and replaced the ballots in the ballot box, where they remained until after the polls closed. At that time they were removed and placed on a table in the election room where the counting of votes was taking place, and remained there until after the count had been completed. The certificates of result were prepared by the officials, and, in accordance with the statute, one was taken to the outside and placed upon the door. After that had occurred, according to the testimony, the attention of the election officials was called to the absentee ballots, and the officers then proceeded to examine and count them. It was found that they were all voted for contestee, and the certificates, including the one which had been taken outside of the building, were changed to show a different total vote for contestee.

Code, 3-6-10, provides: "* * * the election commissioner shall open the envelope containing the absent voter's ballot in such manner as not to deface or destroy the affidavit therein and take out the ballot or ballots inclosed therein, without unfolding or permitting the same to be unfolded or examined. The commissioners shall then deliver such ballot or ballots to the poll clerks, who shall at once proceed to write their names on the back of each of such ballots in the same manner as other

ballots are required to be endorsed. A commissioner shall thereupon deposit the same in the ballot box, and the poll clerks shall indicate in the appropriate place on the registration record in the same manner as if he had appeared personally, the fact that such absent voter had voted, and shall enter the absent voter's name on the poll book. * * *"

In *State ex rel. Hammond v. Hatfield, Mayor, et al., supra,* by an evenly divided Court, it was held that inasmuch as these ballots "were not [properly] placed in the ballot box between the opening and closing of the polls that the provisions of Code, 3-6-10, had not been substantially complied with." The Court said: "In this regard, therefore, the action of the board in not counting the ballots is affirmed by an evenly divided Court." It is not contended by counsel for contestee that the holding of this Court as to the 4 absentee ballots would not, ordinarily, be the "law of the case", and, therefore, *res adjudicata,* but he contends that the question was not decided by an evenly split vote of a four man Court. The West Virginia Constitution, Article VIII, Section 4, provides that: "No decision rendered by the supreme court of appeals shall be considered as binding authority upon any of the inferior courts of this State, except in the particular case decided, unless such decision is concurred in by at least three judges of said court." Code, 58-5-20, is identical with the constitutional provisions. Subject to a few exceptions, not here pertinent, the determination of issues by this Court on a former hearing becomes the law of the case. *Smith v. United Fuel Gas Co.,* 115 W. Va. 127, 174 S. E. 782; *Kaufman v. Catzen,* 108 W. Va. 1, 150 S. E. 371; 3 W. Va. & S. E. Digest, Appeal and Error, §1097, and cases therein cited. The case here under consideration is the same case that was before the Court in *State ex rel. Hammond v. Hatfield, Mayor, et al., supra.* There has been only one issue involved in these proceedings, and that is as to whether Hammond or Maynard was elected Mayor of the City of Williamson at the election held on June 10, 1952. The question regarding the absentee

ballots, therefore, though affirmed by an evenly divided Court in the extraordinary proceeding in mandamus, became settled and binding under the statute, and constitutes the law of the case in this subsequent proceeding on writ of error. The ruling of the Circuit Court of Mingo County that this issue was decided by this Court in *State ex rel. Hammond* v. *Hatfield, Mayor, et al., supra,* and, therefore, was *res adjudicata,* was correct.

The contestant contends in his brief and oral argument that all of the 48 ballots which were photostated and considered by this Court in the mandamus proceeding lost their integrity by exposure to tampering as a result of the photostating, and should not be considered in this case.

In *State ex rel. Daugherty* v. *County Court of Lincoln County, et al.,* 127 W. Va. 35, 3 S. E. 321, this Court held that ballots which were exposed to tampering should be discarded by the canvassing board, and that the certificate of the precinct officials should be accepted as the final result of the election in such a precinct. In *State ex rel. Garbert, et al.* v. *Robinson, et al.,* 88 W. Va. 708, 107 S. E. 763, the Court said: "* * * Nor do we think it is competent for the board of canvassers to enter upon an inquiry as to whether or not the ballots were actually tampered with by the party in whose custody they were, or by anyone else, during the time they were unsealed. Under the law they are the primary evidence of the result of the election only when they have been preserved in the manner provided by law, and when it appears that they have not been so preserved they lose their character as such evidence before the board of canvassers. * * *" This question is discussed in the *Mills* case, and many others are cited therein to the same effect. In all of the cases considered by this Court in which it has been held that ballots lost their integrity by exposure to the possibility of tampering, the allegations of exposure were directed to a time prior to the consideration of the ballots by a canvassing board. In this case, there is no contention of tampering, or the exposure thereto, until

after the ballots had been examined by counsel for both contestant and contestee, and passed upon by the board of canvassers at the recount.

On Saturday, July 5, 1952, pursuant to the order theretofore entered by this Court, arrangements having been made therefor, Mr. Frederick D. Allen, who operates a photostating shop in the City of Charleston, came to the office of the Clerk of this Court to secure the disputed 48 ballots for the purpose of photostating them. Counsel for the contestant designated Robert J. Staker and Don Staker to come to Charleston from Williamson for the purpose of securing photostatic copies of the ballots, and counsel for the contestee designated the contestee and Frank Kimball to come to Charleston for the same purpose. The Clerk of this Court requested Allen to bring the package containing the ballots from the Charleston post office to the office of the clerk, but he secured by mistake another package addressed to the Clerk of this Court, and was directed by the clerk to return to the post office and at that time secured the proper package and delivered it to Mr. Hines, the clerk. On the morning of the 5th, contestee arrived early at the office of the Clerk of this Court and was there when Allen arrived with the package containing the ballots which was then opened by the clerk. It would appear from the evidence that Kimball was not in the Capitol at any time. The 48 ballots were delivered to Allen in the presence of contestee, and they proceeded by different automobiles to a parking lot about four blocks from the Allen shop. From the parking lot, Allen, Hammond and Kimball went to the photostating shop, which is located in the basement of the Kanawha Hotel in the City of Charleston, about two miles distant from the Capitol. Sometime after the ballots had been delivered to Allen, the Stakers, couriers for Mr. Lant Slaven, attorney for the contestant, arrived at the office of the Clerk of this Court, and being informed that the ballots had been delivered to Allen, proceeded to the Allen shop. There is a direct conflict of testimony between the Stakers and the other three

gentlemen, Allen, Kimball and contestee as to what transpired at the photostating shop. The Stakers say that when they arrived, Allen, Kimball and contestee were in the vicinity of the machine where the photostatic work was being done, and that from that time until the photostating was completed, approximately three or four hours later, there was opportunity for tampering with the 48 ballots, or such portions of them as had not been photostated prior to the arrival of the Stakers. Allen, Kimball and contestee specifically deny that testimony and state that Allen required not only contestee and Kimball, but the Stakers also, to remain at the front part of the shop at all times during the photostating process. Except for the time the ballots were examined by the canvassing board, both upon the canvass and the recount, and when prepared for mailing to this Court by the city clerk, in the presence of representatives of both parties, they had been kept in a room at the City Hall in Williamson, on the door of which contestant, contestee and the city clerk each had a separate lock, and the room could not be entered without the presence of all three at the same time. Neither the contestant's notice of contest nor his amended notice of contest contains any allegation with regard to the loss of integrity of the 48 ballots by exposure to tampering. The facts relative to the photostating of the ballots are related for such application as they may have to the charge which was contained in the notice of contest that 6 specific ballots were altered at or subsequent to the recount, and prior to their consideration by this Court in the mandamus proceeding. It is not necessary, therefore, to further discuss, or decide, the question of whether the 48 ballots were exposed to tampering under such circumstances as would cause them to lose their integrity. However, we believe it pertinent to say that ballots in the custody of a court for judicial determination, or in the custody of the clerk of that court, would not lose their integrity, except upon evidence much stronger than has been presented in this case. Ballots in the custody of officials of a court should, of course, be carefully preserved, and extreme caution should be ex-

ercised in handling them, particularly where a few votes, or even one, might determine the ultimate result of an election.

Zane Gray Staker, attorney and associate of Mr. Lant Slaven, representing the contestant at the time, but who was not of counsel in the contest, testified that when he received the photostatic copies of the ballots on the 5th day of July, 1953, he stacked them according to precinct, and that in the process of so doing, he observed a ballot which had been marked in ink in the circle on the democratic side of the ticket, and on which, a mark having the appearance of a blot on the republican side of the ticket also appeared. In this regard he states: "At that time, I had positively recalled that those were the only markings on that ballot for I had addressed the recount board respecting that ballot and specifically called to its attention the presence of the bold mark in ink in the circle on the democratic side of the ballot and pointed out to the recount board that the ballot should be counted for Maynard for the reason that the mark appearing on the circle on the republican side of the ticket was quite obviously a blot." Upon observing a penciled X in the block in front of contestee's name, he immediately examined all of the 48 photostatic copies and says it was then that he found the 6 allegedly forged ballots by comparing them with the description of the ballots by counsel at the recount. As heretofore stated, an official reporter was employed by the board of canvassers and took notes of, and later transcribed, the evidence taken before the canvassing board upon the recount, as well as statements and motions made by opposing counsel concerning the 48 disputed ballots.

This Court, in *State ex rel. Hammond* v. *Hatfield, Mayor, et al., supra,* did not consider such statements and motions for the reason that they "are *ex parte* in their very nature and should not be given the effect of evidence of the ballot commissioners, the poll clerks, and persons present at the election." The second point of the syllabus in that case is as follows: "Upon a recount of ballots cast at an

election, a board of canvassers is without authority to consider or determine matters not shown by the election returns or by relevant evidence of the commissioners, the poll clerks, or other persons present at such election respecting such returns, or which may be established only by evidence extrinsic to the election returns." *State ex rel. Bumgardner* v. *Mills, supra.* By agreement of counsel at the beginning of the contest, the transcript of the record of the recount proceeding was made a part of this record, and is marked Contestant's Exhibit "C".

A short ballot was used in the election on June 10, 1952, each being approximately six inches long and five inches wide. Each has only two columns, the left column as viewed by the voter containing the candidates of the democratic party, the right column those of the republican party. On each of the ballots directly under the party emblems is the circle by which a straight ticket may be voted. Beneath the circles are the names of the candidates for mayor, and below each the name of the councilmanic candidate. On no ballot were there more than two names in each column.

The six allegedly forged ballots will be described and discussed individually.

Ballot No. 2, Precinct No. 1: In the circle beneath the democratic emblem, and above the name of contestant there is a heavy X, obviously made with a pencil of soft lead; and in the republican circle a solid figure made by pencil scratches or markings which entirely cover what apparently was an X. In the square opposite contestee's name, there is a neat X, obviously made by a pencil with a sharp point. At the recount, counsel for contestee moved the board to rule this ballot a spoiled ballot, and not count it for either candidate. The contestant, Wilson R. Farrar, a member of the canvassing board, Ersel L. Slater, who at the recount was of counsel for the contestant, all testified positively that the X before contestee's name was not there at the time of the recount. George Ward, official caller for the canvassing board,

testified that though he remembered the ballot, he did not remember the X now appearing in front of contestee's name. The board counted it for Maynard. The record shows no reference to the X before the name of contestee. This Court, in the mandamus proceeding, awarded the ballot to contestee for the reason that the X in front of his name superseded the X in the democratic circle.

Ballot No. 3, Precinct No. 3: This ballot bears an inked X in the democratic circle, and an indistinct X in the upper portion of the republican circle at a point where the distinct X in the democratic circle would rest upon the ballot being folded. There is an X in the square before contestee's name, made with a pencil. The transscript of the proceedings before the canvassing board shows the following as to this ballot:

> "Counsel for Hammond asks that 'Ballot No. 3, Precinct No. 3' be ruled as a spoiled ballot, because there is an apparent X in the Democratic circle and a blotted X in the Republican circle.

> "Counsel for Maynard requests that this ballot, identified as Ballot 3, Precinct 3, be counted for Maynard for the reason that the heavy inked part under the Democratic emblem clearly shows the vote of a straight Democratic ticket, and the thin, blurred mark under the Republican emblem is merely the blotted part left when the two sides of the ballot were folded together."

There was no mention of the penciled X in the square before contestee's name. The contestant, Farrar, Zane Gray Staker, Slater and Ward testified that the X in the square opposite the name of contestee was not there at the time of the recount. The board counted the ballot for contestant, and in the mandamus proceeding, this Court did not count the ballot for either candidate.

Ballot No. 4, Precinct No. 3: This ballot has a heavy distinct X in the republican circle, a thin X in the square opposite the name of the contestee, and a partially obliterated X in the square in front of contestant's name.

The partial obliteration of the latter X is, either by attempted erasure, or a smudge. The transcript of the contest proceeding shows the following:

> "Counsel for Maynard asks that a ballot be identified as Ballot No. 4, Precinct No. 3, and requests the board to count it for Maynard, for the reason there is, opposite Pierce B. Maynard's name in the block provided for the purpose, an X mark indicating the specific casting of a vote for Maynard.

> "Counsel for Hammond resists this motion and calls attention to the attempted erasure in the X appearing in the square before Pierce B. Maynard' name."

There was no reference to the X in the square opposite the name of contestee. The contestant, Farrar, Slater and Staker testified that the X in the square opposite the name of contestee was not there at the time of the recount. The board counted the ballot for contestant, and in the mandamus proceeding, this Court gave it to contestee.

Ballot No. 3, Precinct No. 8: This ballot has a distinct X in the democratic circle, an indistinct X in the republican circle, a heavy line drawn from a point near the center of the republican circle toward the bottom of the circle and extending outside of it, and pencil marks in the square opposite the names of contestee and Leonard Estep, republican candidate for the city council in that ward. The recount transcript shows the following:

> "Counsel for Hammond, as to the ballot identified as 'Precinct No. 8, Ballot No. 3', which ballot appears to have been voted in ink on the Democratic side, folded and the inked X blotted into the Republican circle, and over which blot mark there appear additional marks in the form of an X. We move that this ballot be not counted for either candidate.

> "* * *

> "Counsel for Maynard moved to have this ballot counted for Mr. Maynard, this ballot being the one identified as Precinct No. 8, Ballot No. 3."

The contestant, Farrar, Slater, Ward and Zane Gray Staker testified that the X in the square opposite the name of contestee was not there at the time of the recount. The board counted this ballot for contestant, and this Court, in the mandamus proceeding, with reference to this ballot, said: "Ballot 3, Precinct No. 8, counted by the Board for Maynard, was considered by this Court as a vote for Hammond, except for his admission that it should not have been counted for either party, resulting in a loss of one vote to Maynard from the finding of the Board." The admission that this ballot should not be counted for either party was contained in contestee's petition for writ of mandamus filed in this Court on July 1, 1953.

Ballot No. 8, Precinct No. 9: This ballot bears a distinct X in each of the party circles, as well as X's in the squares before the names of contestant and contestee, and also an X in the square before the name of Joe Marcum, democratic candidate for city council in that ward. The transcript of the recount proceedings shows the following: "Counsel for the Republican candidates ask that a ballot be identified as 'Precinct No. 9, Ballot No. 8', on which ballot there appears an X in the circle below the emblem of both political parties, and an X in the square before the names of Maynard and Marcum, and moved that this be considered a spoiled ballot and not counted." The contestant and Farrar both testified positively that the X in the square opposite the name of contestee was not there at the time of the recount. The board counted this ballot for contestant, and this Court, in the mandamus proceeding, counted it for no one.

Ballot No. 9, Precinct No. 9: This ballot has a heavy X in the democratic circle, several perpendicular pencil marks in the republican circle and two diagonal marks, one of which extends outside the circle, and a very light X in the square in front of the name of the contestee. The transcript shows only that counsel for contestant moved that the ballot be counted for contestant and councilman Marcum. There is no mention of the X in

the square opposite the name of the contestee. The contestant, Farrar and Slater testified that the X in the square opposite the name of contestee was not there at the time of the recount. The board ruled the ballot spoiled, and did not count it for either candidate. This Court stated in the mandamus proceeding that this ballot would have been counted for contestee except for the latter's admission in his petition that it should not be counted for either party.

The only witness who testified for the contestee, regarding the condition of these 6 ballots when they were being considered and observed by the interested parties at the recount, was Mr. E. Gaujot Bias, who was at the time chief counsel for contestee. Mr. S. N. Friedberg and Mr. J. Brooks Lawson, attorneys of Williamson, were also of counsel for contestee at the recount hearing, but neither testified as a witness at the contest hearing. Bias testified that it was impossible to remember accurately the marks on any given ballot. He further stated that he would "briefly and with an alert attempt examine the ballots to determine whether or not any comment or motion or objection was to be interposed on behalf of Mr. Hammond." Again he stated: "In making the motion, I would attempt to describe the ballot with some particularity so that the transcript of that recount would have an accurate word picture of each ballot. I was remiss in some cases. * * * There was considerable haste and tenseness, and, because of that, we were not able to make up a record that would accurately describe these ballots."

Several witnesses for the contestant testified that all interested parties had ample opportunity to observe, and make notations with reference to, the appearance of the disputed ballots, and several supported the testimony of Bias to the effect that counsel were rushed in their consideration of the ballots, and that confusion was created by many observers being present in the room where the contest was being considered.

The memorandum opinion of the Circuit Court of

Mingo County, which was the basis for its subsequent order, reads in part as follows:

"I find no *direct* proof in this record of any such change. Such proof, as there is, is very circumstantial. Contestant argues that if these 6 ballots had shown the mark for Hammond that now appears on them, and that appeared on them when the Supreme Court of Appeals passed on them, such fact would appear in the record of the recount, that some one would have called attention to such marks at that time. * * *

"It is apparent that the Supreme Court, at the time of the mandamus proceeding, had before it these same 6 ballots as well as the transcript of the recount. * * * Therefore, exactly no one says they saw the ballots changed. At most, the fact that the transcript of the recount does not describe or mention the present condition of the ballots, only a suspicion thereby arises. In view of the fact that only a suspicion there about arises, and the matter was before the Supreme Court, this Court is compelled to hold that the proof of tampering is not sufficiently clear and convincing as to justify this Court in throwing these ballots out, or to place any shadow on the remaining 42 that were before the Supreme Court and there passed on."

In *State ex rel. Hammond* v. *Hatfield, Mayor, et al., supra,* the mandamus proceeding to which the Circuit Court of Mingo County refers in its memorandum opinion, it was specifically held that the question of whether the ballots should be declared void on the ground of forgery of X's before a candidate's name, either during or after a recount, was a question of fact which could be established only by evidence extrinsic to the election returns, admissible only in an election contest, unless such evidence came from the commissioners, the poll clerks or other persons present at such election. As heretofore stated, the forgery of the ballots is alleged to have occurred subsequent to the canvass, and during or subsequent to the recount. This question was not before this Court in the mandamus proceeding for reasons

clearly stated in the opinion. The Court said: "As to whether the six ballots immediately under consideration should be declared void on the ground that the Xs appearing in the squares before Hammond's name were forged, and placed thereon either during or after the recount, we simply say that such question is factual, based on matters extrinsic to the record, and is proper for consideration only in an election contest. * * *"

The Circuit Court of Mingo County in its memorandum opinion clearly indicates that its decision as to these ballots was based upon the erroneous impression that this Court in *State ex rel. Hammond v. Hatfield, Mayor, et al., supra,* had passed thereon. The present case being an election contest, the evidence not considered in the mandamus proceeding is properly before us, together with the other evidence adduced at the contest hearing. The uncontradicted testimony of several witnesses to the effect that the X's in the squares before contestee's name were not on the ballots at the recount, the inference arising from a comparison of the description of the disputed ballots by counsel during the recount with their present condition and an examination of the markings on the original ballots, leads this Court to the inevitable conclusion that the marks appearing in the squares before contestee's name were fraudulently placed there at or subsequent to the recount. None but the naive or the very credulous could accept as coincidence the remarkably similiar penciled X's in the squares before contestee's name upon 6 ballots cast at four separate precincts, which X's are completely dissimilar to the other markings appearing on the ballots, two of which were otherwise marked by pen and ink. This Court held in *State ex rel. Jarrett et al. v. Banks, et al.,* 98 W. Va. 332, 128 S. E. 301, that where it was clearly shown that a ballot had been altered or forged, it was not necessary that contestant should prove the time, place or agency of the fraudulent alteration. Judge Hatcher, speaking for the Court, said: "We deem it unnecessary to discuss the conflicting evidence as to the care and custody of the

ballots and the opportunity of access thereto. No matter how close the custody or how great the care, their present appearance is proof that the despoiler found the opportunity." The finding of the Circuit Court of Mingo County, that forgery of the 6 ballots is not clearly shown, is erroneous.

The decision of the Circuit Court of Mingo County in regard to (1) the alleged fraud and irregularities in Precinct No. 4; (2) the question of the qualification of the poll clerk in Precinct No. 6; and (3) the absentee ballots in Precinct No. 3, is affirmed. The decision of that court in regard to the 6 forged ballots is reversed.

Upon the decision that these 6 ballots were forged, we consider them as if there were no X's in the square before contestee's name. The intention of the voter to cast his vote for contestant being clearly discernible when thus viewed, we hold that all 6 ballots were cast for contestant. This results in a net loss of 2 votes for contestee, giving him a total of 1,961 votes, and a net gain for contestant of 6, giving him a total of 1,967 votes.

The contestant Maynard, having received a majority of the valid votes cast at the election of June 10, 1952, is entitled to the office of Mayor of the City of Williamson. Therefore, it is the order of this Court that the contestee Hammond shall forthwith vacate the office of mayor of that city, which he now occupies.

The judgment of the Circuit Court of Mingo County is reversed in part and affirmed in part.

*Reversed in part*
*and affirmed in part.*

LOVINS, JUDGE, concurring:

I concur in the result in this case, but I do not agree with the conclusions shown by point four of the syllabus and the corollary of that conclusion, as expressed in point five. The phrase "law of the case" has received

frequent and extended treatment. Note Black's Law Dictionary, Fourth Edition, page 1030.

It seems that the Court rests its conclusion as to the "law of the case" in the following expressions relative to ballots 8, 9, 10 and 11, precinct number 3, in the City of Williamson, found in the opinion of this Court, written by Judge Riley, in the case of *State* v. *Hatfield,* 71 S. E. 2d, page 818, reading as follows: "Ballots 8, 9, 10 and 11, Precinct No. 3, evidently absentee ballots, were not counted by the Board for either party, and were not counted by this Court, since Judges Haymond and Lovins would count them for Hammond, and Judges Given and Riley would not count them for either party. In this regard, therefore, the action of the Board in not counting the ballots is affirmed by an evenly divided Court. These ballots were not placed in the ballot box between the opening and closing of the polls, and, in the opinion of Judges Given and Riley, they are void because Code, 3-6-10, as amended and reenacted by Section 10, Article 6, Chapter 44, Acts of the Legislature, 1941, has not been substantially complied with. Ballot 8 bears distinct Xs in the Republican circle and in the squares before the names of Hammond and the Republican candidate for Council in the Second Ward. Ballot 9 bears a distinct X in the Republican circle and no other mark on the face thereof. Ballot 10 bears distinct X marks in the squares before the names of Hammond and the Republican candidate for Council in the Second Ward, and no other mark on the face thereof; and ballot 11 bears distinct Xs in the squares before the names of Hammond and the Republican candidate for Council in the Second Ward and no other mark. Were it not for the irregularity in depositing these ballots in the ballot box before the closing of the polls, they should have been counted for Hammond."

A determination of a matter of law or fact must be clear and certain, as will appear from the following points of the syllabus in *Windon* v. *Stewart,* 48 W. Va. 488, 37 S. E. 603. "1. When a question of law or fact is

definitely determined by the Supreme Court, and the case remanded to the circuit court for further proceedings, a party cannot, by new pleadings or evidence, reopen that question. 2. In order that a former decision shall operate as *res judicata,* it must be certain and clear that the precise question was definitely and finally determined; it cannot be made out by inference or argument." Applying the foregoing, I fail to see anything definitely or clearly decided in the language used by Judge Riley in the opinion of *State* v. *Hatfield, supra,* quoted above. Certainly, the law of the case is binding when there has been an actual, definite decision, but I fail to see any decision in the case of *State* v. *Hatfield, supra,* with respect to the ballots above mentioned. The Court's opinion in that case disavows any decision whatsoever, because of a divided Court.

By some process of reasoning, unknown to me, the Court's opinion in the instant case states that it is the law of the case. I am not conscious that the Court decided anything as to the validity of the four ballots in precinct 3. See *Campbell et al.* v. *Lynch et al.,* 88 W. Va. 209, 212, 106 S. E. 869; *Kaufman* v. *Catzen,* 108 W. Va. 1, 150 S. E. 371.

As I understand, in the case of *State* v. *Hatfield, supra,* this Court did not decide any issue of fact or law, with respect to the four ballots. *Hager* v. *Coal Co.,* 112 W. Va. 479, 164 S. E. 666; *Smith* v. *Gas Co.,* 115 W. Va. 127, 174 S. E. 782; *Reynolds* v. *Railway Co.,* 117 W. Va. 359, 185 S. E. 568; *Moran* v. *Coal Co.,* 124 W. Va. 54, 62, 18 S. E. 2d 808; *Ice & Fuel Co.* v. *Dankmer,* 125 W. Va. 299, 24 S. E. 2d 89; *Mining Co.* v. *Klefeld,* 125 W. Va. 301, 24 S. E. 2d 98. All that was done by this Court in the case of *State* v. *Hatfield, supra,* was to set out the facts with respect to the four ballots in precinct 3 and state that the Court, as then constituted was evenly divided and that we did not decide questions relative to the four ballots. I think it is doing violence to logic to say that this Court made any decision whatsoever, either of law or fact, with re-

spect to those four ballots. The quoted language hereinabove set forth clearly shows that.

Another question arises upon considering the validity of the four ballots rejected by the Board and not counted or ruled on by this Court in the case of *State* v. *Hatfield, supra.*

The four absentee ballots seem to have been rejected for the reason that the four ballots in precinct 3 were absentee ballots, though clearly marked for Hammond. As shown by this Court's opinion in *State* v. *Hatfield, supra,* the ballots seem to have been overlooked by the election officers and not counted until after the precinct certificate of the results had been posted. The pertinent statute reads as follows: "At any time between the opening and closing of the polls on such election day, the commissioners of election of such precinct, in the presence of each other, shall open the outer or carrier envelope only, announce the absent voter's name and compare the signature upon the application with the signature upon the affidavit on the ballot envelope and upon the voter's registration record. In case the election commissioners find the affidavit properly executed and attested, that the signatures correspond, that the applicant is a duly qualified elector of the precinct, that he is duly registered, and that the applicant has not voted in person at such election, or, in case of a primary election, if he has not previously exercised the right of suffrage, if he shall have executed the proper declaration relative to his age and qualifications and the party with which he intends to affiliate, the election commissioner shall open the envelope containing the absent voter's ballot in such manner as not to deface or destroy the affidavit therein and take out the ballot or ballots inclosed therein, without unfolding or permitting the same to be unfolded or examined. The commissioners shall then deliver such ballot or ballots to the poll clerks, who shall at once proceed to write their names on the back of each of such ballots in the same manner as other ballots are required to be endorsed. A commissioner shall thereupon deposit the

same in the ballot box, and the poll clerks shall indicate in the appropriate place on the registration record in the same manner as if he had appeared personally, the fact that such absent voter had voted, and shall enter the absent voter's name on the poll book. In the event that such affidavit is found to be insufficient, or that the signatures do not correspond, or that the applicant is not a duly qualified elector in such precinct, or that he has voted in person at such election, or that he has not registered, or that the ballot is open, or has been opened and resealed, or that the ballot envelope contains more than one ballot of any one kind, or, in case of a primary election, if he shall have failed to execute the proper declarations relative to his age and qualifications and the party with which he intends to affiliate, the procedure to be followed shall be as prescribed in this chapter relating to challenges at the polls: *Provided,* That a notice of such a challenge shall be sent by the clerk of the county court to the respective absentee voter by registered mail, with return receipt requested." Chapter 44, Article 6, Acts of the Legislature, 1941, Regular Session.

It will be noted that the entire statute consists of directions to election officers as to the method of handling absent voters' ballots. Mistakes and irregularities caused by the voter, in some instance, destroy the ballots, but mistakes and irregularities in elections made or caused by officers of elections do not affect the election if a fair election has been held. In other words, a statute requiring election officers to perform certain acts was generally held to be directory. In *Morris* v. *Board of Canvassers,* 49 W. Va. 251, 38 S. E. 500, 505, in the body of the opinion will be found the following language: "We know of the large volume of law that statutes regulating elections are frequently treated as directory, and that mistakes and irregularities should not disfranchise a voter, or deprive a candidate of his vote, where the purpose and intent of the voter can be ascertained. *Loomis* v. *Jackson,* 6 W. Va. 613; *Dial* v. *Hollandsworth,* 39 W. Va. 1, 19 S. E. 557." The foregoing principle has been uniformly followed in this jurisdiction in accord with the following statute: "No bal-

lot shall be rejected for any technical error which does not make it impossible to determine the voter's choice." Chapter 44, Article 5, Section 19, Sub-paragraph (b) (3), Acts of the Legislature, 1941, Regular Session. To the same effect is Chapter 3, Section 34, Sub-paragraph (c), Barnes' West Virginia Code Annotated, 1923. To me, this amounts to a statutory command from the legislature to count the four ballots in precinct 3. The objection thereto is highly technical. *Phillips* v. *Board of Canvassers,* 64 W. Va. 715, 717, 63 S. E. 392. Section 724 of McCrary on Elections reads as follows: " 'The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and, on the other, of relieving him from the consequence of a failure on the part of election officers to perform their duties according to the letter of the statute, where such failure has not prevented a fair election. The justice of this rule is apparent, and it may be said to be the underlying principle to be applied in determining this question' ". The above is quoted with approval in *Hatfield* v. *Board of Canvassers,* 98 W. Va. 41, 57, 126 S. E. 708, 714. See *Rollyson* v. *Court,* 113 W. Va. 167, 167 S. E. 83; *Chapman* v. *Co. Court,* 113 W. Va. 366, 168 S. E. 41; *State* v. *Canvassers,* 113 W. Va. 498, 168 S. E. 793; *Brown* v. *Carr,* 130 W. Va. 455, 460 43 S. E. 2d 401; *State* v. *Mills,* 132 W. Va. 580, 53 S. E. 2d 416.

It will be thus, seen by regular and uniform treatment, this Court has followed the statutory command and has refused to reject ballots for technical reasons, when the intention of the voters could be ascertained from the face of the ballots.

Undoubtedly, ballots numbered 8, 9, 10 and 11 show the intent of the voters to cast their ballots for Hammond, and they have been rejected because of an alleged ruling in the case of *State* v. *Hatfield, supra,* by a divided Court. That is not my concept of a ruling, a decision or a judgment on a question of law and fact constituting the "law of the case". I would therefore count ballots numbered 8, 9, 10 and 11 cast at the election held June 10, 1952, in precinct number 3 of the City of Williamson for Hammond.